McCloskey v. Gleason.

C. A. McCLOSKEY AND WIFE v. C. J. GLEASON, ADMR.

[In Chancery.]

*Will, Construction of. Condition in Restraint of Marriage. Administrator. When Liable for Loss Caused by His Agent. Interest. Pay for Services.*

1. CONSTRUCTION. The will provided: "I will to my wife, ——, all my property, both personal and real; but at her decease none of said property is to go to her heirs or my heirs; but it is to be economically used at her decease in constructing a monument for us both.   *   *   * I will that in case of my wife's second marriage my executor shall set aside $4,000, for the purpose of building said monument, which sum is not to be expended for any other purpose; but in case she does not marry and needs it all for her support, she is to have it." The widow remarried. *Held,* that the first clause is limited by the others, and the wife does not take an absolute title to the estate; that the property should remain in the executor's hands during the legatee's life, and if she had remained unmarried, she would have taken the use of the whole and so much of the principal as she needed, the balance to be used in constructing the monument; but as she had remarried, she was only entitled to the use of the entire estate and to the excess of the principle above the $4,000; and at her decease the $4,000 should be used by the executor in constructing the monument. Rules as to construction of wills stated.

2. CONDITION IN RESTRAINT OF MARRIAGE. The condition as to the $4,000, and remarriage was valid. It was a gift over, and the condition subsequent is not *in terrorem.*

3. LOSS. AGENT. LIABILITY OF ADMINISTRATOR. An administrator is liable for the loss of the avails of a note, when the loss was caused by the misappropriation of the funds by his agent appointed by him to collect the same, unless he prove, (*a*) that *at the time* he employed the agent there was an *actual necessity* for such employment; (*b*) that he used the best accredited agencies; (*c*) that, if the agent has used the money collected, there was no delay in recovering it of him; (*d*) that in all respects he has exercised the diligence, care and prudence which a prudent man would under like circumstances; and the burden of proof is on the administrator.

4. NEGLIGENCE. Delay in recovering the money of the agent was negligence: and, although the masters found that the administrator acted in good faith, on his best judgment, and with ordinary care and prudence, he is held liable for the loss, because no *actual necessity* was shown for employing an agent, and no sufficient cause for allowing the agent to hold the money four years without suit to recover it.

McCloskey *v.* Gleason.

5. Parol evidence was admissible to show that there were $50 less due on a note, charged to the administrator by the Probate Court, by reason of an unendorsed payment to the testator.

6. INTEREST. SERVICES. As the administrator mingled the trust money with his own, he is chargeable with the highest legal rate of interest, and can be allowed nothing for his services in caring for the same.

BILL in equity for the construction of the will of David Carpenter ; for an accounting by the administrator; and to charge the administrator with all losses while the estate was in his hands. Heard on bill, answer, traverse, and report of special masters, September Term, 1881, Washington County. REDFIELD, Chancellor, in his decretal order, construed the will to mean that although the widow remarried, she acquired the title and right of disposal of the property in her discretion, with the provision that what should remain at her decease should be expended in building a monument, holding that the second item in the will was repugnant to the first, and, therefore, void. The administrator was allowed certain costs, but was charged with the loss of the $1,000. The facts are sufficiently stated in the opinion.

*S. C. Shurtleff*, for the defendant.

The burden of proof is on the orator to show negligence. *Doolittle* v. *Gookin*, 10 Vt. 265 ; *Gates* v. *Adams*, 24 Vt. 70. The answer is evidence. *Blaisdell* v. *Bowers*, 40 Vt. 126 ; *Rich* v. *Austin*, 40 Vt. 416 ; *Adams* v. *Adams*, 22 Vt. 50. The rule in all the cases is, that an administrator must act with ordinary care and prudence, taking the same care of the trust fund that a prudent man does of his own. *Feagan* v. *Kendall*, 43 Ala. 628 ; *Gould* v. *Hayes*, 19 Ala. 438 ; *Merritt* v. *Merritt*, 62 Miss. 150 ; *Kee* v. *Kee*, 2 Grat. 116 ; *Whitney* v. *Peddicord*, 63 Ill. 249 ; *Smith* v. *Byrns*, 41 Ga. 439 ; *Mikell* v. *Mikell*, 5 Rich. Eq. ( S. C.) 220 ; *Noble* v. *Jones*, 35 Tex. 692.

The burden of proof being on the orators it was incumbent on them to show that the debt could have been collected by the exercise of ordinary care and diligence. *Rubotton* v. *Morrow*, 24 Ind. 202 ; Irwin's Appeal, 35 Penn. St. 294; Shaffer's Appeal, 46 Penn. St. 131; Kelly's Appeal, 8 Penn. St. 288.

McCloskey *v.* Gleason.

*See* Authorities cited in 2 Jar. Wills (ed. 1881) p. 44;'10 Barr, 350; 35 Penn. St. 100; 19 Ohio St. 24; 3 Wend. 415; 34 Ala. 437; 12 Wend. 338; 7 Conn. 568; 10 Barb. 350. The precise question was before the court in *Cathoun's Estate*, 6 Watts (Penn.) 185, and in *Christy* v. *McBride*, 2 Ill. 288. Ordinary care and prudence is the care and diligence which a prudent man exercises under like circumstances. *Briggs* v. *Taylor*, 28 Vt. 180; *Folsom* v. *Underhill*, 36 Vt. 580; *Reynolds* v. *Burlington*, 52 Vt. 300; *Olmes* v. *Bridgman*, 37 Vt. 28; *Spaulding* v. *Wakefield's Est.*, 53 Vt. 660. The findings of the masters are final; and these clearly exonerate the defendant.

*J. A. & Geo. W. Wing,* for the orators.

Will. The first clause gives the property absolutely to the wife. The second clause was void. · Will. Ex. (7th ed.) pp. 1267, 1376; *Walker* v. *Vincent*, 19 Penn. St. 369; *Nagles' Appeal*, 33 Penn. 89; *Kepple's Appeal*, 53 Penn. St. 211; 27 Ill. 33; 6 Rich. Eq. 138; 4 Gray, 368; 6 Mass. 169. All contracts in restraint of marriage are void. *Doe* v. *Freeman*, 1 Term, 389. The defendant is liable for the loss of the $1,000 and interest, having allowed it to remain four years in the hands of an embezzler without note or mortgage. *Smith* v. *Smith*, 4 Johns. Ch. 281; Ad. Eq. 55; 2 Story Eq. s. 1274, n.; 1 Per. Tr. ss. 452, 454; 2 Lead. Cas. Eq. part 2, 1760, 1667, 1800; 5 Ves. 794; 1 Russ. & M. 35; 2 Ib. 89.

The opinion of the court was delivered by

Ross, J. I. The first question is in regard to the construction to be given to that portion of the will of 'Daniel Carpenter, deceased, of whose estate the defendant is administrator *de bonis non, cum testamento annexo*, which relates to the bequest to the plaintiff wife. It is as follows:

"After all my lawful debts are paid, I will to my wife, Heliann Carpenter, all my property, both personal and real; but at her decease none of said property is to go to her heirs or my heirs; but it is to be economically used at her decease in constructing a monument for us both—a family monument. I wish said monu-

McCloskey *v.* Gleason.

ment to be of granite, and to be surrounded and guarded by a substantial fence.

I will that in case of my wife's second marriage my executor shall set aside four thousand dollars for the purpose of building said monument, which sum is not to be expended for any other purpose; but in case she does not marry and needs it all for her support she is to have it."

No trustee other than an executor is named to manage the property. The testator enjoins the practice of economy upon the executor in the administration of his affairs; and gives him instructions in regard to the construction of the family monument. The intention of the testator, if directed to the accomplishment of lawful purposes, is to govern in the construction of his will. That intention is to be gathered from all the provisions of the will. The language in which it is expressed, unless ambiguous, is to receive its natural and usual meaning. If different provisions of the will apparently conflict, such construction is to be given to them as will give effect to all the provisions, unless a clear repugnancy exists between the different provisions. General language, broad enough to pass the entire property of the legacy to the legatee, may be limited in its scope and effect by other provisions of the will. *Richardson* v. *Paige,* 54 Vt. 373. In *Smith* v. *Bell,* 6 Pet. 68, it is held, Ch. J. MARSHALL, delivering the opinion, that the following clause in a will,

" Also I give to my wife, Elizabeth Goodwin, all my personal estate whatsoever and wheresoever, and of what nature, kind and quality soever, after payment of my debts, legacies and funeral expenses, which personal estate I give and bequeath unto my said wife, Elizabeth Goodwin, to and for her own use and benefit and disposal absolutely ; the remainder of the said estate, after her decease, to be for the use of the said Jesse Goodwin," conveyed to the wife but a life estate, and the reversion to the son, Jesse Goodwin. The property bequeathed consisted principally of slaves. Many of the cases bearing on the subject of construing apparently repugnant portions of wills are reviewed by the learned chief justice ; and the general doctrine, announced and adhered to, that the intention of the testator, if ascertainable from the language of the will, when applied to his circumstances

and the objects of his bounty, must govern even if to accomplish that end, a limitation has to be placed upon language that is absolute in terms. Language, apparently giving the legatee unqualified power of disposal, has frequently been held to convey but a life estate. In *Upwell* v. *Halsey*, 1 P. W. 651, the testator directed "that such part of his estate as his wife should leave of her subsistence should return to his sister and the heirs of her body." The court observed : " As to what has been insisted on, that the wife had a power over the capital or principal sum ; that is true, provided it had been necessary for her subsistence; not otherwise; so that her marriage was not a gift in law of this trust money. Let the master see how much of this personal estate has been applied for the wife's subsistence ; and for the residue of that which came to the defendant, the second husband's bonds, let him account." In *Henderson* v. *Blackbern*, 104 Ill. 227, the will gave to the widow, " all my estate, both real and personal, to have and to hold or to dispose of so much of the same as she may need, or wish to use during her lifetime. And after her death, if there is anything left, it is my will that whatever there may be left shall be divided equally between " the testator's son and daughter, the parties to the suit. The defendant claimed the whole real estate by a deed from the testator's wife. It was held, that as it did not appear that the conveyance was necessary to supply " the need or personal use " of the widow, it conveyed no title to the defendant. These are a few of the many cases which might be cited in which the language of the testator, broad enough to confer absolute title and power of disposal of the bequest, upon the legatee or devisee, has by other portions of the will, been limited, and held to convey a less estate. They serve to illustrate the principle that the intention of the testator controls and limits, frequently, his language, which, if standing alone, would naturally have a wider scope, and be given a broader meaning. Applying these principles to the language of the will in contention, it is apparent that the testator did not intend to give to his wife his entire property, with the right and power of disposing of the same as she saw fit. The first clause of the bequest, " I

will to my wife, Heliann Carpenter, all my property, both personal and real," is the only one in which the language used is broad enough to give her the absolute title to his estate. But this clause is followed by the qualifying clause, " at her decease none of said property is to go to her heirs or my heirs; but is to be economically used * * in constructing a monument." The construction of the monument is left to his executor. If the widow marries, the executor is to set apart a specified sum for that purpose. If she does not marry, she is to have it all, only in case she needs it for her support. When the whole will is considered, it is quite manifest that it was the intention and expectation of the testator that the property would remain in the hands of his executor or his successor, during the life of his wife; that she was to have the use of the whole property and so much of the principle as she might need for her support, even if it absorbed the entire estate, if she remained unmarried; but so much of it as should not be needed for her support was to be used by the executor in constructing a monument "for us both," in the language of the will. In case she remarried, she was to have the use of the entire estate during her life, and the excess of the principal above four thousand dollars. The estate has never been passed to the possession of the plaintiff wife. She has remarried. It has become the duty of the defendant to " set aside four thousand dollars for the purpose of building said monument, which sum is not to be expended for any other purpose," and to pay the balance of the principal to the plaintiff wife; and also to pay the income of the four thousand dollars annually to her during her natural life. The testator, doubtless, was aware that in case she remarried, her support would legally be cast upon her second husband, and that the necessity for using any of the principal for that purpose would cease. There is not a full sentence in the will that gives the wife, unqualifiedly, the testator's property or any portion of it, except the excess above four thousand dollars in case she remarries. To the first clause of the bequest, in which the broadest language is used, there is attached the qualification that none of it shall descend to her heirs, nor the testa-

tor's heirs; but that it shall be used for a specific purpose. The last clause of the bequest, "in case she does not marry," conditions her right to use the principal, or any portion of it, upon the existence of a necessity that it should be so used to furnish her a support. The condition that if the widow remarried, she should forfeit all right to have four thousand dollars of the legacy used for her support, although she might be in necessitous circumstances, was one that the testator had a legal right to make. 2 Jar. Wills, 44, n. 2, and cases cited. The four thousand dollars, the conditional right to have which used for her support, if needed for that purpose, on her remarriage, was set apart for a specific purpose. There was, therefore, a gift over as to that sum; and the condition subsequent in regard to the remarriage, could not be regarded on the somewhat questionable authorities, *in terrorem* only. 2 Jar. Wills, *supra; Parsons* v. *Winslow,* 6 Mass. 169 ; *Doe* v. *Freeman,* 1 Term, 389.

II. Another contention is, whether the defendant is to account for the one thousand dollars lost through Dr. Richardson. The main facts bearing upon this contention are, that Dr. Richardson formerly resided at Montpelier, and was a man of good repute, both financially and as a man ; that he was named by the testator as his executor and duly qualified and acted for several years, but removed to Winona, Minnesota, whereupon he resigned and the defendant was appointed administrator *de bonis.* When he settled his account he passed over to the defendant a note for $1,900, secured by mortgage on land near Winona. This was in December, 1867, and the note matured May 20th, 1870. The defendant, at once upon receiving it, placed the note in the hands of Dr. Richardson for collection. The money due thereon was paid to him at the maturity of the note. In the August following, Dr. Richardson sent the defendant the amount collected by him except $1,000, for which he offered to give to the defendant a good note secured by mortgage bearing twelve per cent interest. The defendant declined the note, asked for payment, preferring to invest the $1,000 East. In August, 1872, the defendant consulted Joseph A.

Prentiss, a lawyer at Winona, who advised him that he considered Dr. Richardson good, but that he had his property locked up in real estate which was not then saleable, and advised against bringing a suit. He also consulted H. D. Morse, a business man of Winona, in January, 1874, and sought to collect the $1,000 through him. He replied that he looked upon Dr. Richardson as responsible, and that he thought the claim could be collected in time without suits or costs; and in a subsequent letter doubted if the doctor could give satisfactory security, and asked for further instructions. Dr. Richardson died in the summer of 1874. The claim was proved against his estate, but nothing received thereon. The defendant also received in 1873 two letters from Dr. Richardson, in which he promises to pay as soon as he could, and states that he has a large amount of real estate, which was slowly appreciating, but that money was tight and it was difficult to realize upon it; and in the last letter he states that he had been sending money east to parties whose needs seemed to him to be greater than the Carpenter estate, but that times were looking better, and that he should begin in September to send him money, monthly, as he made collections. This letter is dated August 25th, 1873. These letters were put in evidence by the defendant. On this contention the masters say: "We find that Gleason in the matter of the collection of the $1,900 note, and that part thereof that was finally lost, acted in good faith, and on his best judgment, and with ordinary care and prudence."

On these facts, has the defendant legally accounted for the $1,000, or shown that it was lost without his fault? He insists that the burden is upon the orator, to show that the loss was occasioned by his fault. As a general proposition this is true. They show that he received a good note, secured by mortgage, which was paid at maturity to him, or his agent. Showing this, it is incumbent on the defendant to give a legal excuse for not having the money, received on the note; in other words, to account for the note, and the money collected thereon. His excuse, in substance, is, that nearly three years before it was

due he gave the note to Dr. Richardson for collection; that he collected it, and appropriated $1,000 of it to his own use, without the consent and against the will of the defendant; and that he continued so to hold it, for more than four years, without suit, and so far as is found, without any special effort to recover it except by writing an occasional letter, until Mr. Prentiss was applied to in August 1872. It is not found, nor shown, that he was authorized to enforce collection. It is found that the defendant sought to collect the $1,000 by Mr. Morse early in 1874. It is contended that the finding of the masters that the defendant "acted in good faith, and on his best judgment, and with ordinary care and prudence," is a legal excuse. But we apprehend, that lying back of this finding, are the questions, when and under what circumstances an executor, or administrator, may properly part with property, as evidences of property of the estate? and how far, and when, is he responsible for the default, or mis-feasance of the person to whom he intrusts a portion of the property of the estate for a particular purpose? The answer to be given to these questions is important to the defendant, to the orators, to trustees and *cestuis que trust*, generally. So far, as we are aware, they are now first presented for the decision of this court. We have endeavored to give them the careful consideration which their importance deserves. The defendant held this debt to collect for the estate when due. Persons undertaking to collect debts, as a general proposition, are responsible for the negligence, misdoings, and defaults of their agents, or attorneys, in making the collection and paying over the money. Whar. Neg. ss. 532, n. 6, 753, n. 3; Whar. Ag. ss. 275, 276, 544, n. 6; *Floyd* v. *Naugle*, 3 Atk. 568; *Whitney* v. *Mer. U., Ex. Co.*, 104 Mass. 152; *Am. Ex. Co.* v. *Haise*, 21 Ind. 4; *Riddle* v. *Hoffmans', Ex.* 3 P. & W. (Pa.) 224; *Simmans* v. *Rose*, 31 Beav. 1; *Bradstreet* v. *Everson*, 72 Penn. St. 124, and cases cited in the opinion by AGNEW, J. He clearly shows that collection agencies and attorneys who receive a debt for collection, and who intrust the collection thereof to a sub-agent, or another

McCloskey *v.* Gleason.

attorney, are responsible for the misapplication of the money collected by such sub-agent or other attorney. A distinction is made in the cases between receiving a debt for collection and receiving it to forward for collection. In the latter case he is not responsible, if he has used due diligence, care and prudence in selecting a reliable, skillful and responsible sub-agent or other attorney to whom he forwards the claim for collection. But he must, to exonerate himself, exercise this degree of diligence, care and prudence in making the selection at the time he forwards the claim. I Perry on Trusts, states the same doctrine as applicable to trustees and executors. Sec. 441: "But if a trustee employs an agent and the agent steals or appropriates the property intrusted to him, the trustee will be held responsible; that is, the trustee is not responsible for the crimes of strangers, but is responsible for the criminal acts of agents employed by him about the trust fund." (1)

Sec. 444. * * * "Or if they (trustees) place their papers and receipts in the hands of their solicitor, so that he can receive their money, and misapply it (2), or if the money is so paid into bank that it may be drawn out upon the check of one trustee and misapplied, * * * or if the money is left improperly, or unadvisedly in the hands of a co-executor or co-trustee so that he has an opportunity to misapply it; all the trustees will be responsible for any loss that may occur to the trust fund (3), so trustees are liable for the attorneys and solicitors whom they employ."

Sec. 463. "Trustees must personally see to it that the security is forthcoming upon parting with the money; as when they allowed their solicitor to receive the money upon representation that the mortgage was ready, and there was no mortgage, and the solicitor misapplied the money the trustees were held liable

(1) *Bestock* v. *Floyer*, L. R. 1 Eq. 28; *Hapgood* v. *Perkin*, L. R. 11 Eq. 74; *Eaves v. Hickson*, 30 Beav. 136.

(2) *Ghost* v. *Waller*, 9 Beav. 497: *Rawland* v. *Witherden*, 3 Macn. & G. 568.

(3) *Langford* v. *Gascoyne*, 11 Ves. 333, 252; *Underwood* v. *Stevens*, 1 Mer. 712; L. R. 7 Ch. App. 429.

18

to make up the loss (4), when money is paid in to a banker or broker for investment, the trustees must see that the investment is made at once and the securities taken in proper form, or they will be liable for any loss that may happen (5), or when money is suffered to remain in the hands of third persons unnecessarily and a loss happens, the trustees must make it up."

The principles thus announced are supported by the citation of numerous authorities, as shown in the note. A brief examination of some of those cited, will show more clearly the grounds and extent of the responsibility of trustees for the negligence and misdoings of their solicitors.

In *Ghost* v. *Waller*, 9 Beav. 497, by a marriage settlement trustees held property with power to sell and invest the proceeds for certain trusts in which the wife finally became sole *cestui que trust.* The wife and trustee joined in a sale of the estate but the trustee alone receipted for the purchase money. He handed the conveyance to the solicitor of the wife, who completed the sale, received and retained the purchase money, which was lost by his subsequent bankruptcy. Lord LANGDALE, Master of the Rolls, says: "Cases of this kind where the court has to determine which of the two innocent parties is to sustain a loss, must be attended with great hardship." * * * "Here the trustees, being asked to execute the conveyance and sign the receipt, did it accordingly, and placed the conveyance in the hands of Osbaldston. By that means they enabled him to receive the purchase money." * * * " I am of opinion that the money which they enabled him to receive was subject to such trusts as might arise from the settlement, and that the trustees became liable, for they authorized the payment of the money to him, instead of taking possession of it and investing it on the trust of the settlement."

*Rowland* v. *Witherden*, 3 Macn. & G. 568. In 1838, the trustees sold some of the trust property and paid the sum realized to their solicitor to be invested on mortgage. He used the money,

---

(4) *Rowland* v. *Witherden*, 3 Macn. & G. 568; *Hanbury* v. *Kirkland*, 3 Sim. 265; *Broadhurst* v. *Balyny*, 1 Y. & C. 16; *Ghost* v. *Waller*, 9 Beav. 497; 13 Beav. 336.

(5) *Challen* v. *Shippan*, 4 Hare, 555; 13 Beav. 336.

but represented he had made the investment, and paid to the *cestui que trust* as for the interest received on the investment to 1847, when the trustees first learned no investment had been made. The vice chancellor dismissed the bill. Lord Chancellor Truro reversed this decision, saying: "As to the liability of the trustees I entertain no doubt. The short result of the case is, that the trustees instead of themselves seeing to the investment of the trust fund, delegated that duty to their solicitor, who misapplied the money."

*Hanbury* v. *Kirkland*, 6 Eng. Ch. (3 Sim.) 265. Trustees in a marriage settlement had power to change the securities with the consent of the wife. On her application two of the trustees executed a power of attorney to the third, who with his partners was the solicitor of the wife, authorizing him to sell some stocks and invest the proceeds in a 5 per cent mortgage, which he represented he had an opportunity to do. The co-trustees gave the authority without making inquiry into the matter. The third trustee, solicitor of the wife, sold the stocks, applied the proceeds to his own use, paid the interest as of a 5 per cent mortgage two or three years and absconded. His co-trustees were held liable, the vice chancellor saying, "The trustees in this case have been guilty of most culpable negligence" on the ground that they had trusted to the representation of the wife and the absconding trustee without giving their personal attention to the matter.

*Bestock* v. *Floyer*, L. R. 1 Eq. 26. The trustee, having trust funds paid in, handed them to his solicitor to invest. The solicitor was of good repute and large practice, and amongst many other offices held that of steward of the manor of Beverly Water Towns. He professed to invest the sum on a mortgage of certain copyholds of that manor, and handed the trustee a bundle of papers which showed the investment, complete with the exception of the receipt, of the tenant of the copyhold estate mortgaged, for the money advanced. The interest was paid for ten years to the *cestui que trust through* the solicitor, apparently, but really *by* him, when he died. The other facts appear

sufficiently in the following extract from the opinion, by Sir J. ROMILLY, M. R. : .

"The case is too clear for argument; the liability of the trustee is a matter of everyday occurrence in the court. If the trustee had handed the £400 to his solicitor, and he had not invested it at all, but simply retained it for his own use, there could be no doubt of the trustee's liability. It was argued, however, that the criminal act of the solicitor made a difference. Now what took place was this: the solicitor, being steward of a manor, fabricated (the act did not amount to a forgery) a surrender of actual copyholds by an actual tenant on the rolls, but he did not give to his client a receipt for the money to secure which the surrender purported to be made, and on reference to the court rolls, the whole thing is found to be a fiction." * * * "This is simply the case of a person employing his servant to do an act, and the servant deceiving him, and any loss so occasioned must fall on the employer, and not on the *cestui que trust*. Of two innocent persons, therefore, one of whom must suffer by the wrongful act of the solicitor, the loss must fall on the trustee, who employed him, and did not take all the precautions he might have taken against being deceived. The fund must be replaced with interest at four per cent." *Hapgood* v. *Parkin*, L. R. 11 Eq. 74.

The investment was made by the Solicitor of the trustee in 1857. He had an abstract of the mortgage premises to 1855. He did not require a fresh abstract, but trusted to the statement of the solicitor for the other party, that no mortgage had been placed upon the premises in the meantime.

Lord ROMILLY, M. R. "This case involves to some extent a question of very considerable importance, which broadly stated, and without qualification is shortly this: If trustees are defrauded, and by reason of the fraud practiced upon them lose part of the trust estate, does the loss fall upon them or upon the *cestui que trust?* In *Eames* v. *Hickson* I held that, if a person obtained trust property from trustees by means of forgery the loss fell on them, and not on the *cestui que trust*. Here

the trustees advanced trust money on a property sufficient to cover the mortgage, if it were a first mortgage, the fact of the existence of a prior mortgage was carefully concealed from them * * * * The question is, on whom does the loss fall ? First, it is material to consider the course pursued by the solicitor of the trustees. It is true his conduct is not theirs, but he is appointed by them, he is their agent for the management of the affairs of the trust, and if he misconducts himself through ignorance, or negligence, or wilfully, he is answerable to the trustees, and they cannot in my opinion, throw any of the loss thereby occasioned upon their *cestui que trust.*" * * " But trustees are bound to employ competent persons, and if they do not the loss must fall upon them." * * " Without evidence and without inquiry they advance the money at once, obtaining only a second mortgage." * * " I use the expression, '*they do this,*' because it is exactly the same, if it be done by the trustees themselves personally, or by an incompetent or negligent agent. They must, therefore, bear the loss, and not the *cestuis que trust* whom they were appointed to protect."

These cases are recognized and approved in 2 Lead. Cas. Eq., part 2d, pp. 1756, 1766, 1767.

In 3 Will. Ex. (6th Am. ed.) p. 1921 (1817), the learned author states the same doctrine. He says: " Generally speaking, if an executor appoints another to receive the money of his testator, and he receives it, it is the same thing as if the executor himself had actually received it, and will be assets in his hands ; and consequently appointing another to receive, who will not repay, is *devastavit.*" See authorities cited in note *e.* There are two authorities in that note which apparently hold that an administrator, who in good faith employs an agent in another State to collect a debt due the estate, will not be held for the appropriation by the agent of the funds collected to his own use. The case *Christy* v. *McBride*, 2 Ill. 75, I have not examined. But *Ragner* v. *Pearsall*, 3 Johns. Ch. 578 there cited, was placed by Chancellor KENT upon the peculiar circumstances of the case. The executor, whose estate was attempted to be holden in his

lifetime, placed certain claims which he held as such executor in the hands of an attorney for collection. The claims were good and well secured. Nothing was collected during the life of the executor. Some years after the attorney collected and appropriated the money to his own use, and became insolvent. Those interested in the estate made no move to close it, until long after the misappropriation by the attorney, and having obtained a judgment against the attorney, brought the bill against the executors and heirs of the original executor twelve years after his death. As the loss did not arise during the life of the executor, and considering the delay of those interested in the estate, in moving to close it up, the learned Chancellor held, that the executors and heirs of the original executor were not liable for the default of the attorney. This decision rests upon the peculiar facts of the case, and does not contravene the general doctrine.

The leading cases in Equity, *supra.* 1758, and Williams Ex. *supra.* 1923 (1819) give as the result of all the best authorities on the subject the opinion of Lord COTTENHAM in *Clough* v. *Bond*, 3 Myl. & Cr. 496, (S.C. 8 Sim. 594), in which he says: " Although a personal representative, acting strictly within the line of his duty, and exercising reasonable care, and diligence, will not be responsible for the failure, or depreciation of the fund in which any part of the estate may be invested, or for the insolvency, or misconduct of any person who may have possessed it ; yet if that line of duty be not strictly pursued, and any part of the property be invested by such personal representative in funds or securities not authorized, or be put within the control of persons who ought not to be intrusted with it, and a loss be thereby eventually sustained, such personal representative will be liable to make it good, however unexpected may be the result, however little likely to arise from the course adopted, and however free such conduct may be from any improper motive. Thus if he omit to sell property, when it ought to be sold, and it be afterwards lost, without any fault of his, he is liable *Phillips* v. *Phillips.* Free. C. C. 11 ; or if he have money

due upon personal security, which, though good at the time, afterward fails; *Powell* v. *Evans*, 5 Ves. 839 *Tebbs* v. *Carpenter*, 1 Madd. 290. And the case is stronger if he be himself the author of the improper investment, as upon personal security or an unauthorized fund. Thus, he is not liable upon a proper investment in the 3 per cents for the loss occasioned by the fluctuations of that fund; *Peat* v. *Crane*, 2 Dick. 499, n.; but he is for the fluctuations of any unauthorized fund; *Hancom* v. *Allen*, 2 Dick. 498. *Howe* v. *Earl of Dartmouth*, 7 Ves. 137-150. So when the loss arises from the dishonesty or failure of any one to whom the possession of part of the estate has been intrusted, necessity, which includes the regular course of business in administering the property, will in equity exonerate the personal representative. But if, without such necessity, he be instrumental in giving to the person failing possession of any part of the property, he will be liable, although the person · possessing it be a co-executor, or co-administrator, *Langford* v. *Casgoyne*, 11 Ves. 333; Lord *Shipbrook* v. Lord *Hinchinbrook* 11 Ves. 252; 16 Ves. 477, *Underwood* v. *Stevens*, 1 Mer. 712."

These decisions and annunciation of principles are but a fuller exemplification of what is set forth in the decisions of this court, as the diligence, care, and prudence, which a prudent man would exercise under like circumstances. *Holmes* v. *Bridgman*, 37 Vt. 28; *Spaulding* v. *Wakefield's* Est. 53 Vt. 660; *Barney* v. *Parsons*, 54 Vt. 623. They require the personal attention, and active intervention of an executor in the possession, protection, security, collection, and management of the estate. The result most favorable to the defendant, to be deduced is that an executor cannot turn the discharge of any of his duties in that behalf over to third persons, except from *actual necessity*, without making himself liable for their negligence, misconduct, and misapplication of any part of the estate, by which a loss results to the estate, and when an actual necessity arises for the employment of another, he is bound to select and use the best accredited agencies, and to use vigilance, and prudence in selecting the agency to be used, and make the selection at the time

the necessity arises.   When he intrusts the discharge of any of these duties to another, in case of a loss arising therefrom, if he would exonerate himself, he takes the burden of showing the existence of an actual necessity for employing such third person, in the matters of the trust, and that he has used this measure of vigilance, care and prudence in making the selection.   This is as it should be.   He is selected for his supposed fitness for a careful discharge of the duties of the trust, and gives security therefor.   Without showing such actual necessity and such careful selection, he cannot be heard to say, " I turned the discharge of a part of my duties over to an agent, and he has misapplied the funds, or they have been lost through his negligence."   Without showing such actual necessity for using the services of another, and such care in his selection such agent is the chosen agent of the executor, or administrator, his hand in executing the trust, answerable to him alone, and he is answerable over to the estate for any loss sustained by the employment.   There would be no safety for estates upon any other basis.   The careful inquiry into the fitness of the person proposed, his selection and appointment and the requirement of security for the faithful discharge of the duties of the appointment, might as well be dispensed with, if he can, at pleasure, turn the discharge of the duties over to agents and attorneys, and shield himself from responsibility for their misdeeds and negligence, in the discharge of duties, cast by the appointment upon him personally.   Applying these principles to the facts of the case at bar, no necessity is shown for intrusting the collection of the note, which was good and well secured to Dr. Richardson nearly three years before the note fell due, nor is any actual necessity shown for intrusting it to any one.   It is true, the debtor and security were in Minnesota.   But it is not shown why the defendant might not have collected the note himself, and if not himself, through the usual accredited business agencies of banks, or express companies.   By selecting his agent nearly three years in advance of any occasion to use him, and parting with the possession of the note, the defendant precluded, a careful inquiry into the financial standing, and fitness of Dr.

Richardson for the discharge of the duty, when the note fell due. In this, at least, there was a departure from the strict line of his duty, in the employment of some one other than the usual accredited business agencies to make the collection he admitted. The masters have made no finding in regard to whether the defendant used due diligence to recover the $1000, eventually lost, unless included in the words " ordinary care and prudence." We do not think that this amounts to such finding and that, in allowing Dr. Richardson to hold the money, in defiance of right, without suit for four years, and for two years, without applying to any one, to aid or advise him, in regard to the circumstances and intentions of Dr. Richardson, showed any such activity by the defendant, in attempting to recover the $1000, as amount to due diligence. The defendant had refused Dr. Richardson as a debtor and his proffered security. He decided that its recovery from him was necessary. In the language of Mr. Perry in his work on Trusts, vol. 1, § 440, where a collection is necessary : " It is not enough for the executor to apply for payment through an attorney ; he must follow the collection actively by legal proceedings, unless he can show that such proceeding would have been futile and vain." He has not shown, nor have the Masters found that active legal proceedings would have failed to have realized the money. All the communications from Dr. Richardson, Mr. Prentiss and Mr. Morse show the contrary. When an agent uses the money and refuses to pay it, on demand, without asserting any right in himself to retain it, the indications are unfavorable for realization, unless most active, immediate measures are used, for its recovery. Delay under such circumstances is negligence. In this also we think, the defendant has failed to show the existence of any such state of facts as will exonerate him from responsibility for the loss.

But it is said, in argument by the defendant's counsel, that this court is not inclined to hold trustees to the full measure of liability established by the courts of England, and by most of the State courts of last resort, and in evidence of this contention he cites the decision of this court in *Barney* v. *Parsons*, 54 Vt.

623. While, under the circumstances of that case, the defendant was not held liable because he loaned a small amount of his wards' money on personal security, the learned judge who gave the opinion, gave special warning that it was not intended " to abate in the least from the strict and rigid requirements of the *fiduciary* in regard to the *cestui que trust ;* or impair in any degree the protection which the law throws about him." No inclination is shown to cut loose from the safeguards and well settled rules which have been judicially established for the protection of trust estates and to launch upon the open sea of speculation and peculation which some trustees and their agents have brought to the management of trust property. It may be a hardship, in this case, to compel the defendent to make good the loss incurred through his agent, Dr. Richardson, a man, who is shown to have enjoyed the confidence of the testator when alive ; but the well established rules governing the management of trust estates cannot be relaxed for that reason.

III. Parol evidence was properly admitted by the masters to show there were $50 less due on the Blackwell note, by reason of an unendorsed payment made to the testator, than was shown by his receipt to Richardson, with the amount of which he was charged by the Probate Court. He was entitled, when called upon to account for the trust property which he had received from the former executor, to show by parol testimony that one of the notes received by him had been partially paid to the testator, though no endorsement of the payment had been made, and for that reason he could not realize the face value of the note. The correctness of the record of the Probate Court was not involved in the trial of this issue, nor did the testimony offered have a tendency to impeach that record. Admitting that record and his receipt to be correct, the question at issue was, how much could the defendant realize on that note, when the unendorsed payment was shown to exist ? He was to be charged with, and account for, whatever, in the exercise of due care, prudence and diligence, he could realize from the Blackwell note, and no more.

IV. The defendant mingled the trust estate with his own,

made no separate investment, and kept no separate account of the same, nor of the interest received thereon. He thereby made himself the debtor of the estate. When he paid anything thereon to the *cestui qui trust*, he paid so much of his own debt. He was chargeable with the highest legal rate of interest on the money so intermingled, and can be allowed nothing for services in caring for the same. *Spaulding* v. *Wakefield's Est.*, 53 Vt. 660; *Farenell* v. *Steen*, 46 Vt. 678. No other wholesome rule could be adopted. The law requires that the trustee should keep the trust estate separate, and that he shall neither make nor lose by its lawful management further than a reasonable compensation for his services. Every inducement to vary from a strict and careful performance of these duties, should be removed. Such estates most generally belong to a class who are not able to care for them themselves. But very little safety would remain for such estates if the trustee should be allowed to use them in his own business, or to employ them in his private speculations. Too many have been, and are being, ruined in that way. Too often, it is to be feared, the control of such estates are sought by persons who wish to, and do use them in their own private business or speculations. Instead of relaxing the rule charging the trustee—who so intermingles the trust estate with his own that he cannot tell what property belongs to the estate, nor what gains he is making thereon—with the highest legal rate of interest, and allowing him nothing for his services, it should be made more stringent. Such intermingling is a gross betrayal of the trust, and should receive no countenance in a court of equity.

The decree of the Court of Chancery is reversed, as to the construction to be given to the will and as to the allowance to the defendant for services in caring for the trust property which he intermingled with his own, and is affirmed in other respects. The cause is remanded, with a corresponding mandate.