WILL OF ROEBKEN: ROEBKEN and others, Appellants, vs. CARBYS and others, Respondents.

*October 14, 1938—February 7, 1939.*

For the appellants there were briefs by *Schanen & Linley* of Port Washington and *Rix, Kuelthau & Kuelthau* of Milwaukee, attorneys, and *Carl B. Rix* of Milwaukee and *Victor Linley* of Port Washington of counsel, and oral argument by *Mr. Rix, Mr. W. F. Schanen,* and *Mr. Linley.*

For the respondents Hedwig Backus and Walter A. Backus, general guardian, there was a brief by *Corrigan & Backus* of Milwaukee, attorneys, *A. W. Grady* of Port Washington, guardian *ad litem,* and *Walter D. Corrigan, Sr., A. C. Backus,* and *A. C. Backus, Jr.,* all of Milwaukee, of counsel, and oral argument by *Mr. Walter D. Corrigan, Sr.,* and *Mr. Grady.*

For the respondent J. O. Carbys, administrator *de bonis non,* there was a brief by *Carbys & Wolf* of Milwaukee.

WICKHEM, J.    The evidence in this case required a printed case of five hundred thirty-seven pages and an original record of nearly one-thousand three hundred pages, and from this

some idea may be had of the difficulty of stating the facts with the proper degree of accuracy and still keeping the opinion within useful length.

The decedent, William J. Roebken, died November 12, 1907, leaving a last will and testament. He left surviving him Ida Roebken, his widow, whom he named as coexecutor and who, except for certain legacies to be paid out of the rents and profits of the estate, was to have the entire income of same during her life. Ida Roebken died April 30, 1934. Decedent had seven children. The oldest, Arthur Roebken, coexecutor and ultimately the surviving executor of the last will and testament, died August 21, 1937. The other children were William H. Roebken, Ida Roebken Bruederle, Norma Roebken Boerner, Edward T. Roebken, Adeline Roebken Rix, and Frieda Roebken Ritter. Ida Bruederle died March 11, 1928, leaving two sons, Walter J. Bruederle and Allen Bruederle. Norma Boerner died June 5, 1929, leaving five children, Lillian, Ralph, Kenneth, Russell, and Shirley Boerner, all minors. The third coexecutor under the will was J. Fred Wittenberg, brother of decedent's widow, Ida Roebken. Mr. Wittenberg died in 1925. The principal assets of decedent's estate consisted of three hundred shares of stock in the Badger Worsted Mills and forty shares of stock in the Cedarburg Woolen Mills. The Badger Worsted Mills was a family corporation organized by decedent and engaged in the manufacture of woolen yarns at Grafton, Wisconsin. At the time of testator's death the authorized capital stock was one thousand shares, of which four hundred shares were unissued. Of the six hundred shares issued, testator owned three hundred shares, Daniel Wittenberg two hundred shares, and William H. Hilgen one hundred shares. At that time Arthur Roebken was twenty-four years of age and William H. Roebken was twenty-one years old. Both were employed at the mill and immediately assumed the man-

agement of its affairs, Arthur becoming president and William vice-president of the company. The executors opened an account on the books of the Badger Worsted Mills in the name of the Estate of William J. Roebken, and in this account entered moneys received and disbursed on behalf of the estate. Upon the payment of expenses of administration and debts of the estate this account was closed and an account opened on the books of the Badger Worsted Mills company in the name of Ida Roebken, widow and life tenant, and the executors purported to credit to this account all moneys received for her and charge it with moneys paid out on her behalf. It is claimed that as the widow needed money for living and other expenses, she would request these sums from her sons and have checks issued by the Badger Worsted Mills for the sums requested. An account covering receipts and disbursements from November 12, 1907, to January 1, 1912, was filed in county court. This account was filed by the executors, and a request for the allowance of this account was signed by all of the heirs who were of age and by the guardians *ad litem* for the minor heirs. An account designated as "Executors' Account No. 2" was filed covering the period from January 1, 1912, to April 15, 1922. This was signed by the executors, and its allowance requested by all of the heirs and legatees. Accounts were filed by Arthur W. Roebken, sole surviving executor, covering the period from April 15, 1922, to April 30, 1934, and interlocutory accounts were filed during the progress of this litigation. The matter of the approval of these accounts was not brought on for hearing until 1934. As may be expected from the length of time covered by these accounts and the unconventional way in which the affairs of this estate were handled, the county court found, as this court does, great difficulty in cutting through the confusion and arriving at a fair and accurate conclusion as to the state of the accounts. The most convenient approach to the

problem is to consider each finding of the trial court to which objection is made by appellants, and ascertain with respect to it whether the evidence sustains it and whether proper rules of law were applied. The county court, embarrassed by the confusion and difficulty of the matter, had a certified public accountant examine the accounts and make a report thereon. The significance of this and its results will be commented upon later in the opinion.

The first assignment of error relates to the "7th" finding of fact. This finding of fact has to do with the first account filed by the coexecutors. In that account the executors claimed as credits against corpus various payments amounting to $1,401.18, asserted to have been paid out of the corpus in discharge of debts of the testator. These were disallowed by the trial court for the reason that no oral or documentary evidence was submitted in support of these credits. Sec. 317.10, Stats., provides:

"Where an executor or administrator shall in good faith pay any claims against the estate without the same having been filed, such payments may be allowed upon proof that said claims were just demands against said estate and were paid within the time limited for the presentation of claims. Notice that application will be made for such allowance to the executor or administrator shall be served personally or by mail upon all persons interested in such matter at least twenty days before the day of hearing or by publication as provided in section 324.20. Payment shall be allowed on a *pro rata* basis with other claims when the estate is insolvent."

There is a complete absence of proof to meet the statutory requisites. While some of the items, such as death notices, medicine, nurse, etc., might conceivably be for the final illness of testator, most of the items carry no indication on their face as to what the purpose of the expenditures might have been. It is claimed that the auditor's report shows deductions from corpus and accounts of William J. Roebken paid in a some-

what greater sum than that claimed for allowance. The auditor's report is wholly based upon the books of the Badger Worsted Mills and adds nothing to the account of the executors. It in no way furnishes the evidence required by the estate. It seems quite clear to us that the executors fell into the error of failing to preserve vouchers and invoices which would have established beyond possibility of reasonable conflict that the claims were those of testator, that they were just demands, and that they were paid within the time limited for the presentation of claims. Not having done this, and having allowed about twenty-five years to elapse before the matter was presented to the court for approval, they are now the victims of a situation which they themselves have created. The trial court was not compelled, in the face of such informality and delay, to assume that the payments from corpus were properly disbursed. Hence, we conclude that this finding of fact must stand.

Another contention applicable to this assignment of error as well as to one other subsequent assignment is that all of the heirs who were of age and those who then were minors through their guardians *ad litem* requested the allowance of this account and consented to its allowance in 1912 when the account was filed. We think this contention cannot prevail, under the doctrine of *Will of Leonard,* 202 Wis. 117, 230 N. W. 715, and *Will of Stubbs,* 213 Wis. 439, 250 N. W. 845. There is no evidence of such a disclosure or explanation to the heirs of the facts essential to an understanding upon their part of the "consequences of. the transaction" as will warrant a finding of waiver. The relation of the executors to the heirs was fiduciary, and the doctrine which flows from this circumstance is well stated in *Will of Leonard, supra,* and need not here be repeated. It is enough to say that we deem it applicable to the present situation. We also consider that what is said in *Will of Leonard, supra,* concern-

ing the burden upon the executor to keep accurate accounts, and the rule that if he does not all presumptions are against him and all obscurities and doubts are to be taken adversely to him, is applicable in considering whether the trial court properly surcharged the account with respect to items involved in this assignment of error.

The next objection is to the "8th" finding of fact, but it need not be discussed here because this finding is a summary and stands or falls with our conclusions concerning the individual items of which it is composed. One of these items has just been considered, and such other items as are in controversy will be considered elsewhere in the opinion.

The next objection is to the "10th" finding. This finding has to do with the relations and state of accounts between the executors and the life tenant. The first paragraph of finding 10 is to the effect that two dividends from the Cedarburg Woolen Mills are not shown by the accounts of the executors to have been paid to the life tenant. One of these dividends was declared on December 15, 1907, in the amount of $680. The other was declared on January 2, 1912, and was for the sum of $720. It is contended by appellants that one of the audits shows that these amounts were fully paid to Mrs. Roebken. On the other hand it is contended the audits in question are not evidence and that these payments are not even contained in the accounts of the executors or in receipts filed by the life tenant as of the date of the account. We shall not incumber this opinion by a detailed exposition of what the record properly shows with respect to these sums. We are of the opinion that another circumstance precludes the heirs of Mrs. Roebken from now raising any objection to these items or claiming a surcharge with respect to them. Both items antedate the executors' account which was dated April 15, 1922. This account certifies to the fact "that as appears under the credit items of said executors' account No. 2 the

said executors paid to the widow who was thereunto entitled to the said income of said estate received since January 1, 1912, that the payments so made to said widow amount to the sum of $66,180, and that her receipt therefor is filed herewith." The petition of the executors concludes with the statement that the estate of the decedent has been settled and requests that a time and place be fixed for the examination and allowance of this account. At another point in the petition the allegation is repeated that the entire income of the estate was paid by the executors to the widow. This is accompanied by a receipt executed by Ida Roebken which lists the payments made to her during the period from 1912 through January, 1922, and concludes with a statement: "The said payments made to me as aforesaid by said executors represents the entire rents, profits and income of said decedent's estate since January 1, 1912, and such payments have been made to me under and in accordance with the last will of said decedent." This receipt and the petition and account are both signed by Ida Roebken. The first account, which is dated January 1, 1912, was signed by Mrs. Roebken, and contains in its petition for allowance a statement that the total net income for the period accounted for after making certain deductions alleged to be proper was $17,668.45, and that this balance of the estate was paid to the widow and her receipt taken for it. This petition contains a statement that so far as may be the executors have administered the estate of the decedent and they ask for the allowance of the account. In the face of this representation by the life tenant made to the court that the amounts due her during these periods had been fully discharged and paid, and her requests that the accounts be allowed, we are at a loss to understand how her heirs may at this stage of the proceedings open these accounts and surcharge the account of the executors. The situation is not analogous to that of the heirs on the one side and an executor on another. Previously in this opinion we held that as to

the first account the heirs, even though they had requested the allowance of the account and executed a signed approval of it, might, in accordance with the doctrine of the *Leonard* and *Stubbs Cases,* still insist upon statutory proof. Here, however, Mrs. Roebken was one of the coexecutors. She was charged with a responsibility equal to that of her coexecutors to see that the estate was properly administered. Proper administration called for the payment of the income of the estate to the life tenant. She certified to the court on two occasions covering the period from the death of the testator to April, 1922, that the estate had been properly administered and that the total income had been turned over to her. Those who claim under her are in no position now to go behind that certification any more than she would be were she alive today. It is our conclusion that the executors' account should not be surcharged in the amount of these two items.

The next paragraph of finding 10 involves the disallowances of credits to the executor amounting to $4,811.12. These consist of numerous items the earliest of which is March 23, 1922, and the latest of which is November 8, 1933. The ground of disallowance is that the items listed are not supported by vouchers or documentary evidence, and that the only testimony offered in support is that of William Roebken which is contradictory and in some instances concerns matters on which he could have had no knowledge. The trial court concludes that as a result all of the items are in grave doubt, and that having failed to keep clear and distinct and accurate accounts, the obscurities and doubts should be construed against the executor. For these reasons the items were disallowed. In this connection we dismiss at the outset the contention of appellants that the audit of Haskins & Sells, ordered by the trial court, shows these expenditures to have been for the account of Mrs. Roebken. The audit simply reports charges on the books for whatever they are worth. It does not constitute independent evidence, and

hence it will be necessary to examine the evidence in connection with each of these items and to consider each item upon its merits and in accordance with the evidence applicable to it.

The first group of items consists of seventeen payments made not to the life tenant directly but to the coexecutors, Arthur W. Roebken and William H. Roebken. Three payments are listed to Arthur W. Roebken. One of these is an item of $23. There is no evidence concerning the disposition of this except that a check was isued in the regular course of business. The second item is for $26.75, and no evidence came in concerning this item except that a check was issued in that amount in the regular course of business. The third item of $32.65 represented a portion of a larger check and was supported by testimony of Edward Roebken that this was issued for repairs on an oil burner. There were fourteen items in which payments to William Roebken are charged against the account of the life tenant as money paid for her benefit. According to the testimony of William Roebken, the first item of $21 was either for merchandise or cash loaned by William to his mother. The next item of $18 was testified to be for merchandise purchased by William for the life tenant. A following item of $40 is testified to constitute repayment to William of a loan which Mrs. William Roebken had made to the life tenant. There was in evidence a check for a larger sum, $40 of which was charged to the life tenant. The next item is for $3, and the testimony is that a check for $7 was issued to William, $3 of which was charged to Mrs. Roebken. An item of $13.50 follows, supported by evidence that a check was issued for $47.50 for merchandise purchased, of which the life tenant received merchandise to the value of $13.50, and authorized the charge against her account. The next item was $12.36, and there is evidence that this check was in payment of aluminum purchased by

the life tenant, and that William Roebken was president of the Cedarburg Advancement Association, at whose fair the aluminum was purchased. This is claimed to account for the fact that the check was made payable to William Roebken. The next item of $93.85 appears to have no evidence to explain or support it. An item of $10.50 is supported by evidence by William Roebken that this was to pay for automobile parts, or rather to reimburse William who had purchased the parts for the life tenant's automobile. Items of $12, $2.30, and $6 are claimed to have been for merchandise purchased by William for the life tenant. In at least one of these instances, the check was for a larger sum, and the amount charged was the amount claimed to represent merchandise turned over to the life tenant. Items of $12, $8.80, and $9.05 are not supported by any evidence. The testimony in support of these payments is about what might be expected in view of the number of years that have elapsed since the transactions in question. With reference to the $21 item heretofore mentioned, Edward Roebken was asked what this was for and his answer was, "money advanced by William for something he bought her and charged to him." He was asked, "Did you see him advance the money to her?" and his answer was, "My recollection does not go back that far, to such a transaction it's impossible to remember such details." He was asked, "You do not know whether or not you saw William Roebken advance that money to your mother?" and his answer was, "if it's on the records it was done." Concerning the same item William testified that the check was for an obligation that his mother had to him, and that he could not remember the specific goods. "It might have been for sweaters, automobile robe or a small cash loan I made or for groceries, canned goods, things like that that I bought for her and advanced the money and that she reimbursed me for." It seems to us that testimony such as this in the face

of objections to the account might well have left the trial court unconvinced that these payments went to the life tenant. As heretofore stated, it is the rule, as pointed out in the *Will of Leonard Case, supra,* that if a person in a fiduciary relationship fails to keep clear, distinct, and accurate accounts, obscurities and doubts are to be construed against him. There was no effort to get receipts or to preserve documentary evidence, or even to keep the books in such shape that they might make a *prima facie* case of payments to the life tenant. On their face, the payments appear to have been made to Arthur and William Roebken and not for the benefit of the life tenant, and the court was asked to rely on the hazy memories of William and Edward Roebken as to the manner in which these sums went to the benefit of the life tenant. The trial court could properly hold that the executor had not discharged his burden of resolving all obscurities and doubts in the matter, and we conclude that the account was properly surcharged by the amount of these seventeen items.

There follow twenty-six items, none of which were paid directly to the life tenant or to Arthur or William Roebken. Each of these payments was claimed by the executor to have been made for the benefit of the life tenant and all were disallowed as credits by the trial court. The first of these items was for $215.55 to John Armbruster. In support of this there was a check for $229.85 containing a pencil notation on the back, "Mrs. Wm. J. R. $215.55, A. W. R. $14.30." There was a bill from Armbruster to Mrs. William J. Roebken dated February 1, 1932, for radio purchased December 20, 1931. The amount of the bill was $215.55. It was receipted February 3, 1932. There was evidence by George Armbruster that he did business under the name of John Armbruster Jewelry Store and that Mrs. Roebken purchased a radio and some jewelry to the amount of $215.55, that she selected the radio, and that the bill was paid by the Badger

Worsted Mills. We are of the opinion that the evidence satisfactorily establishes that this item was paid to the life tenant and that it should have been credited to the executor.

The next item in the amount of $169.31 was the first of several items payable directly to railroads, and these items may be considered together. This payment was to the Baltimore & Ohio Railroad Company, and there was a check in evidence payable to that company. The testimony of William is to the effect that this was in payment of two fares to Washington, D. C. The evidence with regard to this item is quite specific and definite, as is also the testimony that she requested the issuance of the check for transportation. Next follow three items of payments to the Chicago, Milwaukee & St. Paul Railroad Company. The first is for $170.73, testified to be in payment for a round-trip ticket to California. The next item is for $115.16. This item was supported by a check for $230, with a pencil notation, "½ for Mrs. W. J. R." Testimony was that this represented Mrs. Roebken's fare to California. An item of $170.26 appears to have no testimony specifically applicable to it. There is, however, applicable to all these items of payments to the railroads evidence that Mrs. Roebken did take several trips to California and at least one or two to Washington. The respondent Hedwig Backus testified that the life tenant took at least five trips to California and one to Washington. Mrs. Frieda Ritter, daughter of the life tenant, testifies to five or six trips to California by train and two trips to Washington that she recalls. There is evidence to the same effect by William Roebken. While the evidence in connection with these payments is not quite as satisfactory as that with respect to the Armbruster item, we think that the evidence clearly shows that the three items concerning which there was specific testimony should have been allowed as having been paid for the benefit of the life tenant. With respect to the last item of $170.26 to the Chi-

cago, Milwaukee & St. Paul Railroad Company we are of the opinion that general testimony that Mrs. Roebken made several trips is not enough to establish the item.

The next item is $398 to the L. F. Bartelt Company. This is supported by a check drawn in favor of the Bartelt Company on December 2, 1922, and by an original invoice dated November 1, 1922. Testimony of Walter A. Bublitz is to the effect that he was associated with the Bartelt Company, which was engaged in the furniture and undertaking business, and that on December 1, 1922, Mrs. Roebken purchased a parlor suite and table, the total amount being $398. The furniture was delivered to Mrs. Roebken's home and the bill paid by the Badger Worsted Mills. William testified that the check was for furniture purchased by his mother. There is also a sales slip in the handwriting of Walter Kirmsse, who handled the transaction, according to the testimony of Bublitz. We see no reason why this item should not be allowed as a credit. The evidence establishes beyond any reasonable controversy payment of this sum for the benefit of the life tenant.

The following item of $5.81 to the Chicago, Milwaukee & St. Paul Railroad Company is claimed to be for shipping charges. The check in this case was for $10.61, and the amount charged claimed to be the life tenant's share. This item was not satisfactorily established, and the same comment that was made concerning the payments to William and Arthur Roebken is applicable to this.

In the same class fall items of $48.51 and $120.59 to Goll & Frank, supported only by the testimony of William that they were for goods purchased for the life tenant and that the check in the latter item was for $191.99, of which Mrs. Roebken's share was $120.59; an item of $25.27 to Phillip Gross Hardware Company claimed to be for the life tenant's share for the larger amount of merchandise purchased; an

item of $4.06 to the Martz Knitting Company, testified to have been the life tenant's share of merchandise purchased, the total amount of the purchase being $12.06; an item of $3.37 to Sears Roebuck & Company; an item of $12.75 to Sears Roebuck & Company; an item of $3.50 to Martz Knitting Company; an item of $10.48 to Shadbolt & Boyd Company; items of $38 and $25 to the West Bend Woolen Mills Company; and an item of $6.25 to Fred Wulff. It is not considered necessary to discuss these small items in detail. It is enough to say that in many of the cases the purchase is claimed to represent a part of a larger purchase. In some cases the item is supported by a check for this larger amount or by an invoice for the larger amount. The evidence, however, is unsatisfactory and indefinite and the court properly disallowed all of these items.

The next item is for $126.68, paid to Frank's Tire Shop. This is supported by a copy of a bill from the tire shop to Mrs. Roebken containing these charges for tires purchased by Mrs. Roebken. There was in evidence a check in the amount of $126.68, payable to Frank's Tire Shop, the date of the check corresponding to that of the invoice. There was also evidence by Edmond H. Frank to the effect that he sold the tires to Mrs. Roebken. We think this evidence was clearly sufficient to support a credit to the executor and that it should have been allowed.

The next item was for $378 to Walter H. Kirmsse. It was testified by William Roebken to be for furniture purchased by Mrs. Roebken from Kirmsse. This was supported by a check for even amount drawn by the Badger company to Kirmsse, and there is in evidence a receipted voucher. Kirmsse testified that the furniture was actually sold to Mrs. Roebken and that the bill was correct and paid by the Badger concern. The item was satisfactorily established and should have been allowed. We come to the same conclusion with

respect to two items of $95.40 and $375 also payable to Kirmsse. These are supported by vouchers and checks. With respect to the last item, the evidence is that this charge was for the funeral expenses of Ida Bruederle and that Mrs. Roebken ordered the funeral charged to her. The date of the charge and payment is April 20, 1928, and the death of Ida Bruederle was in March, 1928. The evidence is clearly to the effect that Kirmsse acted as the undertaker at the funeral and it satisfactorily appears that this item should have been allowed.

The next two items were for $400 and $93.53. William Roebken testified that the check for $400 was in payment for an Oil-O-Matic oil burner purchased from the Klug Electrical Shop. William H. Klug testified that he did business under the name of the Klug Electrical Shop, that he installed an oil burner in the home of Mrs. Roebken, and that this was purchased by her with directions that the bill be sent to the Badger Worsted Mills. The total price of the burner was the sum of the two items named, and Klug testified that the $400 was the first payment. There is a bill showing cash payment to Klug of $400 and stating a balance of $93.53, and an acknowledgment of the payment of the balance on the date upon which the life tenant is charged upon the books of the Badger Worsted Mills. The check, however, is for $182.28, and contains a pencil notation, "A. W. R. $88.75, Mrs. Wm. J. $93.53." It seems to us that there is no question under the evidence that the oil burner was purchased by Mrs. Roebken and paid for by checks from the Badger Worsted Mills. This item should have been allowed as a credit.

The next charge was for $568.85 to Motor Service Corporation. It was testified that this was for repairs to the life tenant's car. There is a check in evidence showing the expenditure but no bill, invoice, or receipt, or other testimony to support the credit. William's evidence was to the effect

that the motor had been damaged by being driven without grease or oil, and that his recollection was that this entire amount was for repairs upon the life tenant's car. The expenditure in question was made in 1922, and we see no reason why the trial court should have been compelled to accept William's recollection after such a time had elapsed and when such a large amount was involved for the repair of a single car. In this connection the court might well have misgivings because of the apparent practice testified to by William and Edward Roebken of issuing checks for larger amounts in cases where the life tenant's share of the bill was relatively small.

The next is an item of $86.48 to the Mullin Body Tank Company, and this was supported by testimony of William Roebken that the amount was applied in payment of a tank purchased for the life tenant's oil burner. There is a check in evidence but no bill from the company and no testimony aside from that of William. It appears that the charge in question was made at about the time that the oil burner was installed. We think, however, that the trial court's misgivings about this item were justified and the credit properly disallowed.

The next item was for $244.17 to A. Pendl. The record contains a check in this amount drawn to Pendl, and William Roebken testified that the payments were for plumbing work which his mother had ordered. Pendl testified that the work was ordered by Mrs. Roebken and billed to her, and that he received a check from the woolen mills for that amount. There is a copy of the invoice in the record, the copy having been made in 1934 and the charge being March 29, 1927. In view of the supporting testimony, we think this item should have been allowed.

The next item was one of $50 to A. J. Roesch. There was testimony that Roesch was a real-estate agent in California and that the life tenant had invested in land there and re-

quested that a check be sent to this man for $50. The check is in evidence and contains upon it evidence of having cleared the California banks. Testimony in support is solely that of William Roebken, and we think there is sufficient doubt as to this item to warrant the trial court disallowing it.

There follow two items of $208 and $143.10, respectively, to Schnabel & Wegner. This was a hardware, automobile, and implement concern. Mr. Schnabel testified that both items were for tires installed on Mrs. Roebken's car, the items being four years apart in time. He testified that Mrs. Roebken came to the store, ordered the tires charged to her, and the bill sent to the Badger Worsted Mills. There are checks showing the payment to Schnabel & Wegner and receipts by them. The evidence is sufficiently satisfactory to require the allowance of these credits.

Two items of $5 and $31.18 to the Wegner Hintz Company are testified to represent respectively repairs and insurance on the life tenant's automobile. There are checks in the record showing the payments and bills showing the charges to Mrs. Roebken. These items are sufficiently established and should have been allowed.

The next item is a payment of $100 to Fred Wolfram. Testimony of Frieda Ritter is to the effect that the life tenant frequently went to Little Cedar Lake and that while there she rented a cottage from Mr. Wolfram. A receipt, the date of which corresponded with the item, is in evidence from Wolfram, acknowledging receipt from Mrs. Roebken of $100 for rent of the cottage. This item was clearly established and should have been allowed.

From the foregoing examination of the record, it is our conclusion that the executor was entitled to additional credits or deductions from surcharge in the following sums: $215.55; $169.31; $170.73; $115.16; $398; $126.68; $378; $95.40; $375; $400; $93.53; $244.17; $208; $143.10; $5; $31.18;

$100. The remaining items totalling $1,542.31 were properly disallowed.

It is appellants' contention that the county court had no concern with what Mrs. Roebken did with her income and that this inquiry was largely irrelevant. This contention, however, misses the point. The question is whether the executors actually paid the income to the life tenant or at her direction and the trial court's conclusion was that the executor had not established the fact that this had been done. Wherever these conclusions are justified, the surcharge must be sustained.

Findings 11 and 12 are to the effect that in four instances sums were erroneously paid out of the corpus to the life tenant, and that the executor is liable to the remaindermen therefor. These consisted of three notes of D. Wittenberg, Jr., $344.05, one note of James Trottman for $125, and a portion of the purchase price of Cedarburg Woolen Mills stock, $5,000. The conclusion of the trial court is attacked only as to the last item. It will be recalled that in the original inventory in the estate there was listed forty shares of Cedarburg Woolen Mills stock of the value of $6,000. On May 2, 1925, the executor sold this stock for $9,000. Of this sum, $5,000 was paid to the life tenant. Appellants concede that $2,000 of this $5,000 was a part of the corpus, but contend that the $3,000 profits must be assumed, in the absence of evidence to the contrary, to have constituted profits from operation and not increment or increased capital value. It is contended that as between life tenant and remainderman, ordinary profits on the sale of stock belong to the life tenant, and that the burden was upon the contestant to show that the profits resulted from increased value of capital assets, citing *Will of Barron,* 163 Wis. 275, 155 N. W. 1087. Respondents contend that the entire $5,000 belongs to corpus and with this contention we agree. The Pennsylvania rule which

calls for the apportionment between life tenant and remainderman of the proceeds of a sale of stock or subscription rights on the basis of a finding of fact as to what part of the appreciated price is the result of earned profits which have not been declared as dividends and what part represents increment, was given some recognition in *Will of Barron, supra,* but has been repudiated in Pennsylvania and in the recent case of *Estate of Merrill,* 196 Wis. 351, 220 N. W. 215. Mr. Bogert, in his work on Trusts, while recognizing that the apportionment rule is theoretically more just, condemns it as being nearly impossible of application. He states (Vol. 4, p. 2399, § 824) :

"It seems extremely doubtful whether any one can ever know exactly why a certain stock has increased in market price twenty points between the date of the acquisition of it by a trustee and the date of its sale. The purchaser of the stock himself probably could not analyze his own reactions and tell why he bid one hundred twenty for the stock. He could not assign a certain percentage of his bid to one cause and another percentage to a second motive. Economic and business experts can give testimony which is sure to conflict.

"The court in allocating a part of the increase to the life *cestui* is accomplishing dubiously approximate justice and is acting on the basis of guess work and opinion to a great extent. Any trustee who has to decide such a question must indeed be puzzled. If he tries to make a decision on his own account, he will have to spend a great deal of time and some trust money in getting the corporate history of the organization issuing the stock, in studying market reports, and taking the advice of experts. He runs the danger of making a decision which may lay him open to liability at the hands of either L or R."

The situation with respect to allocation of profits upon a sale of stock must be distinguished from cases where stock or liquidating dividends are declared during the life of the life tenant. In these cases an apportionment is required.

See *Estate of Matthews,* 210 Wis. 109, 245 N. W. 122, and *State ex rel. Coykendal v. Karel,* 215 Wis. 505, 255 N. W. 132. After holding that the executor is liable to the remaindermen for these items of corpus, the trial court held that Arthur W. Roebken is entitled to set off these sums against the sum of $6,211.12 for which he is indebted to the life tenant. The effect of this finding is claimed to be that if the sum of $6,211.12 is not a proper surcharge, the executor is deprived of the credit of $5,469.05 on account of this inadvertent payment of corpus to the life tenant; that it is improper to permit a credit to the executor to be offset against a particular item in his account; and that the credit or offset can only be taken against the whole account. We fail to perceive the logic of this contention. He is accounting separately to the remaindermen and the estate of the life tenant. He certainly is not injured if he is given an offset against the life tenant. He certainly cannot claim an offset as against the remaindermen based on overpayment of the life tenant at the remaindermen's expense. It is true that the foregoing findings leave the executor with a balance due him from the estate of the life tenant. In the present state of the record, we think that the consequences of this may be left to the trial court to deal with.

Finding 14 disallows the sum of $721.85 incurred by the executor Arthur W. Roebken for attorneys' fees and auditing costs. The reason assigned is the failure of the executor to keep clear, accurate, and distinct accounts, and to close the estate promptly and efficiently as required by law. This finding must be sustained. The difficulties of this case have largely been caused by the failure to keep adequate accounts, to preserve adequate vouchers, and to present accounts to the court for approval within a reasonable time. The finding was proper in view of sec. 317.08, Stats. See *Will of Leonard, supra.*

Findings 15 to 28 relate to a transaction in the stock of Badger Worsted Mills which resulted in a surcharge of the account of the surviving executor in the amount of $12,750, together with interest amounting to $16,828, for the benefit of six remaindermen, that is to say, of all of the remaindermen except Arthur, the executor, and William, who, while not an executor, was Arthur's associate in the management of the Badger Worsted Mills and who, with Arthur, participated in the stock transaction which is the basis of the surcharge. As heretofore stated, the capital stock of the Badger Worsted Mills was one thousand shares, of which six hundred shares had been issued, three hundred to the decedent, William J. Roebken, two hundred to Daniel Wittenberg, and one hundred to William Hilgen. On February 17, 1911, the widow, Ida Roebken, purchased two hundred shares of stock from her brother, Wittenberg. The stock ownership as of 1915, according to the company's stock certificate records, shows outstanding certificates to William J. Roebken, two hundred shares, William J. Roebken estate, one hundred shares, Margaret Hilgen, ninety shares, William Hilgen, ten shares, Ida Roebken, two hundred shares. On August 22, 1916, the first step in the transaction which is here questioned took place. On that date Mrs. Roebken transferred her two hundred shares as follows: William H. Roebken, sixty-seven and one-half shares; Arthur Roebken, sixty-seven and one-half shares; Frieda Ritter, twenty shares; Norma Roebken (Boerner), twenty shares; and Hedwig Roebken (Backus), twenty shares. It appears quite clearly from the evidence that it was Mrs. Roebken's purpose to permit each of the children other than William and Arthur to purchase twenty-five shares of the capital stock of this company. It will be noted that the first distribution is precisely eighty-five shares short of accomplishing this end. Thus, Norma and Hedwig Roebken only took twenty shares each in the transfer of

August 22d, and were each short five shares of the total
intended to be transferred to them. Edward Roebken, Ida
Bruederle, and Adeline Rix received no stock in the trans-
action of August 22, 1916. On December 21st of the same
year, at an annual meeting of the board of directors of the
Badger company, a resolution was proposed to grant options
to purchase stock at $100 a share to Ida Roebken, no amount
stated, to Edward Roebken, Ida Bruederle, and Adeline Rix,
twenty-five shares each, and to Norma Boerner and Hedwig
Backus, five shares each, the total number of shares involved
in the resolution being the eighty-five shares necessary to
execute the original plan. No action was taken upon this
resolution on this date. At some time between the 21st of
December, 1916, and the 1st of January, 1917, a contract
was executed by Margaret and William Hilgen, Ida Roeb-
ken, Ida Bruederle, Adeline Rix, Norma Boerner, Hedwig
Backus, Arthur Roebken, William Roebken, and Frieda Rit-
ter, as individuals, and by Ida and Arthur Roebken, as ex-
ecutors, waiving all pre-emptive rights in a proposed issue of
two hundred shares of stock by the Badger Worsted Mills,
and requesting that the directors of the Badger company
issue to Ida Roebken eighty-five shares and to Arthur and
William Roebken fifty-seven and one-half shares each of
such new issue. The instrument was dated December 30,
1916. For some reason which does not appear, Edward
Roebken did not sign. On December 30, 1916, a special
meeting of the board of directors of the Badger company
was held at which it was determined not to adopt the reso-
lution of December 21, 1916, heretofore referred to. The
waiver and consent of December 30, 1916, were presented to
the board of directors, and a resolution passed authorizing
the issuance of two hundred shares of stock, eighty-five
shares to Ida Roebken and fifty-seven and one-half shares
each to Arthur and William Roebken. The shares so au-

thorized were issued that day, and on the same day Mrs. Roebken's certificate for eighty-five shares was canceled and certificates were issued as follows: To Edward Roebken, Adeline Rix, and Ida Bruederle, twenty-five shares each; to Hedwig Backus and Norma Boerner, five shares each. Thus, while in form the resolution of December 21, 1916, was not adopted, the same disposition of stock was accomplished as was proposed in that resolution. On December 30, 1916, Mrs. Hilgen, who by the agreement dated the same day had waived her pre-emptive rights, demanded and received the right to purchase thirty of the two hundred shares. The certificates issued to Arthur and William for fifty-seven and one-half shares each were canceled on December 30th, and new certificates immediately issued as follows: To Arthur and William Roebken, forty-two and one-half shares each, and to Margaret Hilgen, thirty shares. The price put upon the new shares was $115 a share, and all transfers of stock, new and old, were made at this price. It was claimed by the objectors to the account, and found by the trial court, that the signatures of the remaindermen to the waiver were secured by statements that the stock was worth only $115 a share, that the right of pre-emption was valueless, that the company was losing money, and that if the transaction were not completed, Arthur and William "would raise their own salaries to large sums and consume the corporate income;" that the remaindermen Frieda Ritter, Norma Boerner, Ida Bruederle, Adeline Rix, and Hedwig Backus were young women unfamiliar with business matters or the affairs of the corporation and relied upon the statements; that the transaction was consummated without the showing of any good faith whatsoever; that no approval by the court was sought or secured; that no report of the transaction was set up in the accounts; that there was no corporate necessity for the issuance of the stock; that the plan was merely for the pur-

pose of reaping a personal gain by the executor Arthur and remainderman William at the expense of the other remaindermen; that the right of pre-emption belonged to the remaindermen and not to the life tenant; that each of the eight remaindermen had the subscription rights to twelve and one-half shares of treasury stock; that the stock was worth $285 a share, and the pre-emptive rights worth the difference between that sum and $115, to wit, $170 a share; and that each of the remaindermen were damaged in the sum of $2,125.

The contentions upon this branch of the case are so numerous and complicated as to make it a matter of some difficulty properly to analyze them and dispose of the issues. At the outset it is necessary to determine whether this transaction is to be considered as one whole scheme or broken up into its various steps and each considered separately. If separately considered, it becomes important to recall that prior to the new issue Mrs. Roebken had disposed of her two hundred shares to five of her children in varying amounts so that at the time the new stock was offered these children had pre-emptive rights not only as remaindermen but as stockholders. In their capacity as stockholders the beneficiaries of the first transaction by which Mrs. Roebken sold her two hundred shares were entitled to subscribe to sixty-six and two-thirds shares of stock. The Hilgens were entitled to subscribe to thirty-three and one-third shares of stock, and the estate of William J. Roebken was entitled to subscribe to one hundred shares of stock. As a result of the resolution and waiver, Ida Roebken, who had no pre-emptive rights, got eighty-five shares of stock. William and Arthur, each of whom were entitled to twenty-two and one-half shares by reason of their existing stock holdings got forty-two and one-half shares each, or a total of forty shares in excess of their pre-emptive rights. William Hilgen, who had pre-emptive rights to three and one-third shares, Frieda Ritter, whose pre-emptive

rights amounted to eight and one-third shares, Norma Boerner, who was entitled to subscribe to six and two-thirds shares, and Hedwig Backus, whose pre-emptive right amounted to six and two-thirds shares, got no subscription rights based on prior holdings. As a result of transfers from Ida Roebken, Norma Boerner, and Hedwig Backus each received five shares of the new stock, and Edward Roebken, Ida Bruederle, and Adeline Rix, none of whom had pre-emptive rights as stockholders, received twenty-five shares each. Thus, if the relations between the parties are to be treated separately, step by step, and each transfer considered to have given rise to pre-emptive rights as of its date, the situation is greatly complicated by the existence of pre-emptive rights in some of the heirs by reason of earlier transfers and in some only as remaindermen. It is also possible, if conclusive effect be given to the form of the transaction, to conclude that none of the six heirs received any pre-emptive rights at all either as remaindermen or as existing stockholders, since the new stock was directly issued to William, Arthur, and Ida, and only reached the other heirs by transfer. Neither of the foregoing approaches presents a true view of the transaction. In the first place, the evidence shows that this was a single transaction, or at least a series of transactions in promotion of a single end; that the scheme was as much that of the mother as of the coexecutor Arthur or remainderman William; and that the purpose of the scheme is perfectly clear from the sequence of events. The mother had two hundred shares of stock. This she could dispose of as she pleased. She proposed to dispose of it so as to give to Arthur and William a larger share of the ownership of the corporation than would be held by the other remaindermen. This was a perfectly natural desire on her part since these two sons were actively managing the business and might have been thought by her to require a larger

measure of control in aid of that management and to deserve a larger measure of interest. It was a part of her scheme, however, to sell to each of the six remaining children twenty-five shares each of the corporate stock and thus to enable them to share presently in the dividends of the company. After making the distribution to William and Arthur which she desired to make, she lacked eighty-five shares fully to accomplish the purpose. The corporation had outstanding less than its authorized capital stock. The plan was, (1) to have each remainderman waive his pre-emptive rights, (2) procure a new issue by the corporation of two hundred shares, and (3) complete the transaction by selling to Norma Boerner and Hedwig Backus the five shares which they were short, and to Edward, Ida, and Adeline the twenty-five shares each which would put them upon an equal basis with the heirs other than Arthur and William. Since Ida Roebken had no pre-emptive rights, and since she needed eighty-five shares of the new stock in order to carry out the transaction, it was necessary to get waivers from all of the heirs in order to carry out the plan. The transaction was carried out, and viewed as a whole each of the remaindermen who, under the doctrine of *Estate of Merrill*, 196 Wis. 351, 220 N. W. 215, and *Will of Jenkins*, 199 Wis. 131, 225 N. W. 733, had a pre-emptive right to subscribe to twelve and one-half shares of this stock, were able to purchase twenty-five shares at $115 a share. It will not do to isolate this transaction and to say that what these children got from their mother is a matter between them and their mother. She was a coexecutor and a party to the plan. She owed the heirs the same duty as did Arthur. While she had no pre-emptive right to subscribe for eighty-five shares when the new stock was offered, she did at the outset have the right to retain her own holding of two hundred shares, and had she done so, that would have carried subscription rights to sixty-six and two-

thirds shares. By the transaction viewed as a whole and regarding substance rather than form, she gave to the remaindermen the chance to purchase twice the number of shares that their pre-emptive rights would have given them, using her own stock to make up the deficit. We deem it immaterial that literally the transfers were by the mother or that some of the remaindermen received new stock and that some received stock from the mother's individual holdings. The shares were indistinguishable and equal in value. That one of the executors advanced out of her own stock enough to initiate and to consummate the transaction was likewise immaterial. The important thing is that the obligations of the executors with respect to the pre-emptive rights were discharged, not how they were discharged. Whether it be considered that as a result of the transaction in question the heirs received their pre-emption privileges in substance, or that having been denied them technically, restitution was made by the mother as coexecutor, the result is the same. There is no right to surcharge the account of the surviving executor by reason of the transaction.

We are not here concerned with the question as to what induced the remaindermen to execute the contract by which they waived subscription rights, or whether under all the facts they are in a position to avoid the transaction. No useful purpose will be served by extending this opinion to discuss and determine the county court's jurisdiction to try such an issue. It is enough to say that if the transaction were voidable for any reason it could be avoided only as a whole and that this would involve restoration of the *status quo* by the heirs. This was neither done nor contemplated. The same comment is applicable to other matters which bear upon the voidability of the contract such as the relations between the parties considered as stockholders on the one hand and directors on the other, and the fact that by the transaction Arthur and William Roebken secured greater voting

power in the corporation. So long as the contract and transaction as a whole stand, it must be found that the heirs were not deprived of their subscription rights and that there is no basis for a surcharge. These considerations make it unnecessary to consider questions as to the value of the stock as of the time when the pre-emptive right attached.

We now approach a peculiar situation in this case that has given us some concern. All members of the Roebken family are appellants with the exception of Hedwig E. Backus and the children of Norma Boerner through their general guardian, Walter A. Backus. Upon this appeal, the court has concluded that in some respects the surcharge was justified and that in others it was not, and while this will result in a diminished surcharge of the executor's account, the amount remaining is substantial. The question is whether those heirs who otherwise would be entitled to share in the amount of the surcharge have waived their rights by joining as appellants and asking that the account of the executor be approved and that all surcharges be deleted. We conclude that this question must receive an affirmative answer. Had the original judgment gone in favor of the executors, and had Hedwig Backus and Walter Backus been the only appellants, a reversal could only have resulted as to so much of the judgment below as affected their interests. *Estate of Onstad,* 224 Wis. 332, 271 N. W. 652; *Lezala v. Jazek,* 170 Wis. 532, 175 N. W. 87, 176 N. W. 238; *Van Matre v. Swank,* 147 Wis. 93, 131 N. W. 982, 132 N. W. 904; *Wanta v. Perszyk,* 207 Wis. 282, 240 N. W. 183, 241 N. W. 377. We think that the same principle applies here, and that the county court should surcharge the account of the executor not in the total sum found by this court to be the proper surcharge but in such portion of it as would normally go to Hedwig Backus and Walter Backus as general guardian. This partial surcharge should be earmarked for the benefit of Hedwig Backus and Walter Backus and should only be sub-

ject to such portion of the expenses of administration as it would have borne had the other heirs preserved their right to participate in the total surcharge.

*By the Court.*—Judgment affirmed in part, reversed in part. Cause remanded with directions to enter a modified judgment in accordance with this opinion. Taxable costs and the expenses of all parties for printing to be paid out of the estate.