IN THE MATTER OF THE ESTATE OF HENRY FERA,
DECEASED.

Argued January 6, 1958—Decided February 17, 1958.

*Mr. Charles J. Milton* argued the cause for appellant (*Messrs. Milton, McNulty & Augelli,* attorneys).

*Mr. Everett M. Scherer* argued the cause for respondent (*Messrs. Riker, Emery & Danzig,* attorneys).

*Mr. George Warren* argued the cause for the guardian *ad litem.*

The opinion of the court was delivered by

PROCTOR, J.  This is an appeal by Theodora Fera Hargrett, the life beneficiary of a trust created by the will of her father, Henry Fera, from the dismissal of her counterclaim in an action instituted by the trustee wherein court approval of the sale of certain trust stock was obtained.  In her counterclaim she sought to have that portion of the proceeds of the sale of the stock, constituting the major asset of the trust, which represented undistributed earnings of the corporation accumulated since the inception of the trust, paid to her as income under the terms of her father's will. Both the trustee and the remainderman opposed the counterclaim, maintaining that the entire proceeds of the sale constituted *corpus.*  There is no substantial controversy as to the facts.

Henry Fera died testate in New Jersey in 1932.  He was survived by his only child, Theodora Fera Hargrett, the appellant herein, and four brothers and five sisters.  Except for articles of a personal nature the entire estate was left in trust.  The Fidelity Union Trust Company and Walter Fera were named executors and trustees.  In 1943 Walter Fera died and the Fidelity Union Trust Company continued as the sole surviving trustee.  The relevant provisions of the will are as follows:

"THIRD:  All the rest, residue and remainder of my estate, both real and personal, wheresoever situate, and of whatsoever constituted, I give, devise and bequeath to my executors hereinafter named, as trustees, in trust, nevertheless for the following uses and purposes; *viz:*

(a) To invest and reinvest the same from time to time and collect the income therefrom.

(b) During the lifetime of my sister, Ella Fera, and so long as she shall be unmarried, to pay to her the sum of Six hundred dollars ($600.00) annually in equal monthly installments.

(c) During the lifetime of my sister, Ada Jones, and so long as she shall remain unmarried, to pay to her the sum of six hundred dollars ($600.00) annually in equal monthly installments.

(d) During the minority of my daughter, Theodora C. Fera, to pay to her legally appointed guardian, the sum of Three thousand dollars ($3,000.00) *per annum*, in equal monthly installments, which amount shall be used by said guardian for the education and comfortable support of my said daughter.

(e) Upon my said daughter attaining the age of twenty-one years, to pay to her during her lifetime in equal quarterly payments, the whole of the net income of my estate, subject only to the annuities, provided for my two sisters in sub-divisions (b) and (c) hereof."

The will was executed in 1928 when the appellant was seventeen years of age. When the will was probated in 1932 she was of age and thus entitled to the "whole of the net income" of the estate, subject to the annuities given the testator's two sisters. The rights of the sisters are not involved on this appeal. Appellant now is married and has one son, age 16, who is the remainderman under the will. As remainderman he is a defendant herein and is represented by a guardian *ad litem*.

Among the assets of the estate were 1,199 shares of the capital stock of A. W. Faber, Inc., whose corporate name is now A. W. Faber-Castell Pencil Company Incorporated (hereinafter referred to as Faber). These shares constituted one share less than 30% of the total outstanding capital stock of the company, which consisted of 4,000 shares having a par value of $100 per share. At the inception of the trust, these shares were carried by the trustee at the value of $126,350.62, or $105.38 per share. The balance of the trust assets were valued at $131,546.91.

Since the creation of the trust, the appellant has received all of the dividends declared by Faber on the stock. From 1932 to 1956 the total net earnings of the company amounted to $1,239,416, of which $771,000 was distributed by way

of dividends. Thus, while distributing approximately 62% of its earnings, the corporation has withheld and accumulated approximately 38% of its earnings.

Following an application by the trustee, the Chancery Division, on March 8, 1957, entered a judgment approving an agreement by the trustee to sell 599 shares of the Faber stock for $153,793.25, or $256.75 per share. Both the appellant and the guardian *ad litem* for the remainderman approved the sale. However, in that proceeding, the appellant interposed a counterclaim seeking judgment that the trustee be directed to pay her, as income beneficiary, to quote from her brief, "so much of the profit of the shares of stock sold as would represent a proper proportion of the net earnings of Faber during the life tenancy withheld from distribution and accumulated as earned surplus, including that portion of the surplus account which was transferred to a general reserve for bad debts and contingencies." She also demanded judgment "for such portion of the purchase price as was generated by the retention and investment of the said surplus."

The trial court dismissed the counterclaim, after concluding that the term "net income," as it is ordinarily understood in dealing with corporate stockholdings, means declared dividends and not "net corporate earnings"; that corporate earnings which are not paid out as dividends are additions to principal, and that proceeds from the sale of stock held in trust constitute *corpus*. An appeal was taken to the Appellate Division and while pending there we certified the cause on our own motion.

The single issue presented is whether the income beneficiary, upon the sale of trust stock, is entitled to that portion of the profit realized from the sale which allegedly represents the net earnings of the corporation that were withheld from distribution and accumulated as earned surplus.

The appellant contends that since the New Jersey courts have consistently applied the doctrine of equitable apportionment, also known as the "Pennsylvania rule," as between the life tenant and the remainderman, in cases involving

declared dividends, the same doctrine should be applied to the profit realized from a sale of stock to the extent that any portion of such profit may be attributable to the existence of surplus and undistributed earnings which have accrued during the life tenancy. The appellant further asserts that when the testator specified that "the whole of the net income" should go to the life tenant he intended the life beneficiary to receive the entire "net earnings" of the company, including any which were retained and accumulated by the corporation.

The question of how to properly distribute, between *corpus* and income, the various benefits received by a trustee through the trust's ownership of corporate stock, where the trust instrument is silent, has indeed proved a vexatious problem to the courts. In attempting to resolve the trustee's dilemma as to whether a particular dividend or benefit should be allotted to income or *corpus*, or apportioned between the two, where the testator has not manifested any specific intention, the courts have divided into three groups, each announcing a different theory. For a discussion of these theories see 4 *Bogert, Trusts and Trustees*, § 843 (1948); 3 *Scott, Trusts* (*2d ed.* 1956), § 236.3.

The "Pennsylvania rule" is based on the theory that the source of every stock benefit, regardless of its form, should be determined and that it should go to the person equitably entitled to ownership of the source from which it was declared. It is a rule designed to achieve as nearly as possible exact justice between the successive interests, irrespective of the difficulty of its application. The "Massachusetts rule" treats all cash dividends as income and all other dividends or benefits as principal. It is a simple, convenient rule based largely upon form. There is no attempt to go behind the declaration of the dividend to ascertain its source and determine the equities in each case. The "Kentucky rule" ignores both form and source. It allocates all corporate benefits to income as of the date they are declared irrespective of the time they were earned.

New Jersey has consistently applied the "Pennsylvania rule" of equitable apportionment to declared dividends. *Lang v. Lang's Executors*, 57 *N. J. Eq*. 325 (*E. & A*. 1898), extraordinary dividends; *Day v. Faulks*, 79 *N. J. Eq*. 66 (*Ch*. 1911), affirmed 81 *N. J. Eq*. 173 (*E. & A*. 1912), stock dividends; *Ballantine v. Young*, 79 *N. J. Eq*. 70 (*Ch*. 1911), extraordinary and stock dividend; *McCracken v. Gulick*, 92 *N. J. Eq*. 214 (*E. & A*. 1920), extraordinary dividend; *Beattie v. Gedney*, 99 *N. J. Eq*. 207 (*Ch*. 1926), extraordinary dividend; *Hagedorn v. Arens*, 106 *N. J. Eq*. 377 (*Ch*. 1930), ordinary cash dividend.

The appellant urges that since we have applied the "Pennsylvania rule" of equitable apportionment in determining the allocation of declared dividends, we should follow the leading Pennsylvania case of *In re Nirdlinger's Estate*, 290 *Pa*. 457, 139 *A*. 200, 56 *A. L. R*. 1303 (*Sup. Ct*. 1927), which extended the rule of equitable apportionment to the proceeds of a sale of corporate stock. In that case the court held that where a trustee sells corporate stock and receives a price greater than the value of the stock at the inception of the trust, and the increase in value is due in part to an accumulated surplus from the earnings of the corporation, accruing during the period of the trust, the life tenant is entitled to an apportionment of the proceeds. But if the profit realized from the sale was due to an enhancement of value, because of an increase in market values or because of an increase in earning power or good will, the profit is part of the *corpus* and goes to the remainderman.

The respondents point out, however, that Pennsylvania has recently adopted the Uniform Principal and Income Act, 20 *P. S*., §§ 3470.1 to 3470.13 (1947), thus expressly overruling the *Nirdlinger* case (see *In re Crawford's Estate*, 362 *Pa*. 458, 67 *A*. 2d 124 (*Sup. Ct*. 1949)), and that New Jersey, in 1952, adopted a similar statute. *N. J. S*. 3*A*:14*A*–1 to 9. *N. J. S*. 3*A*:14*A*–7 provides that all profit or loss arising from the sale of corporate stock by a trustee is allocated to principal. While the

adoption of the above statute reflects the growing trend away from the equitable rule and an increasing acceptance of the "Massachusetts rule" (see Commissioner's Prefatory Note, Uniform Principal and Income Act, 9A *U. L. A.* 225, 226 (1951)), they can have no application to trusts created prior to their effective dates. *In re Crawford's Estate, supra; In re Wehrhane's Estate,* 41 *N. J. Super.* 158, 176 (*Ch. Div.* 1956).

The respondents further contend that *Berger v. Burnett,* 97 *N. J. Eq.* 169 (*Ch.* 1924), controls the case at hand and has decided the question adversely to the appellant, pointing out that the case has been cited (3 *Scott, Trusts,* § 236.12, at *p.* 1837, *n.* 1; 4 *Bogert, Trusts and Trustees,* § 824, at *p.* 271, *n.* 61) as placing New Jersey among those jurisdictions that refuse to follow the "Pennsylvania rule" where the earnings of the corporation have not been distributed among the stockholders in the form of a dividend. In that case the life tenants sought apportionment of the proceeds of a sale of stock held in trust. The court, after noting that no dividends had been paid by the corporation from the date of the testator's death, held that the entire proceeds of the sale were *corpus*. Respondents contend that since no dividends were paid it may be inferred that the corporation retained its earned income as surplus, otherwise there would be no logical reason for the life tenants to seek apportionment. However, a reading of the opinion indicates that the decision was premised upon the rules relating to unproductive property. *Cf. McCoy v. McCloskey,* 94 *N. J. Eq.* 60 (*Ch.* 1922); *Outcall v. Appleby,* 36 *N. J. Eq.* 73 (*Ch.* 1882). In any event, in the absence of a square holding on this point, we prefer to deem the question presented to be an open one.

It is true that in some jurisdictions which apply the "Pennsylvania rule" to declared dividends the rule has been extended to the proceeds of a sale of securities in accordance with the *Nirdlinger* case, *supra*. *In re Kreitner's Will,* 187 *Misc.* 747, 65 *N. Y. S. 2d* 691 (*Surr. Ct.* 1946); *Simpson v. Millsaps,* 80 *Miss.* 239, 31 *So.* 912 (*Sup. Ct.* 1902);

*Wallace v. Wallace,* 90 *S. C.* 61, 72 *S. E.* 553 (*Sup. Ct.* 1911); *In re Sherman Trust,* 190 *Iowa* 1385, 179 *N. W.* 109 (*Sup. Ct.* 1920). But, by the weight of authority, even in those states which have applied the "Pennsylvania rule" to declared dividends, there is no apportionment of the proceeds of a sale of corporate stock by the trustee, although the amount realized is greater than it woud have been if the corporation had not retained earnings which accrued since the inception of the trust. *In re Traung's Estate,* 30 *Cal. 2d* 811, 185 *P. 2d* 801 (*Sup. Ct.* 1947); *Robison v. Elston Bank & T. Co.,* 113 *Ind. App.* 633, 48 *N. E. 2d* 181 (*Ct. App.* 1943), rehearing denied 113 *Ind. App.* 633, 49 *N. E. 2d* 348 (*Ct. App.* 1943); *Smith v. Hooper,* 95 *Md.* 16, 51 *A.* 841 (*Ct. App.* 1902); *Safe Deposit & Trust Co. of Baltimore v. Bowen,* 188 *Md.* 482, 53 *A. 2d* 413 (*Ct. App.* 1947); *Hayes v. St. Louis Union Trust Co.,* 317 *Mo.* 1028, 298 *S. W.* 91, 56 *A. L. R.* 1276 (*Sup. Ct.* 1927); *In re Will of Roebken,* 230 *Wis.* 215, 283 *N. W.* 815 (*Sup. Ct.* 1939); 3 *Scott, Trusts* (*2d ed.* 1956), § 236.12; 4 *Bogert, Trusts and Trustees,* § 824 (1948); *Perry, Trusts and Trustees* (*7th ed.* 1927), § 546(*d*); 13 *A. L. R.* 1009, 1011 (1921); 153 *A. L. R.* 491, 494 (1944).

In *Smith v. Hooper, supra,* 51 *A. 2d* at *page* 846, the court said:

"'The value of stock may be increased by good management, prospects of business, and the like, but such increase is not income. It may also be increased by an accumulation of surplus; but so long as that surplus is retained by the corporation, either as surplus or increased stock, it can, in no proper sense, be called "income." It may become producing, but it is not income.' *Spooner v. Phillips,* 62 *Conn.* 62, 24 *A.* 524, 16 *L. R. A.* 461. Surplus and accumulated reserve funds, until set apart and appropriated by the corporation for the payment of dividends, are capital, and, whatever their magnitude may be, they are not, as between life tenant and re-mainder-man, treated as income until they are distributed. * * *
* * * Increase and income are not synonymous terms. Until detached or separated from the shares whose value it enhances, increase forms part of that value, and, therefore, part of the shares; and, if it be part of the shares themselves, then, whilst it may be profit, it is in no sense income."

140

The rationale of these cases as analyzed by Professor Scott is that:

"* * * [T]he life beneficiary is not entitled to the earnings of the corporation of which the shares are held in trust, unless those earnings are distributed among the shareholders. The mere fact that the corporation is adding to its surplus and thereby increasing the value of the shares, so that when the shares are sold the proceeds received by the trustee are larger than they would otherwise have been, is not enough to entitle the income beneficiary to a share of the proceeds." 3 *Scott, Trusts* (2d ed. 1956), § 236.12.

This is also the rule adopted in the *Restatement of Trusts,* § 236(*f*) (1948 *Supp.*).

But the appellant, again relying upon the *Nirdlinger* case, *supra,* contends that the court should disregard form and look to the substance of the transaction, and thus by applying equitable principles treat the proceeds of a sale of corporate stock as a distribution of the accumulated undistributed earnings. Appellant's theory is that the life tenant has at least an equitable interest in corporate earnings that have been accumulated during his tenancy; if the stock had not been sold and dividends declared out of earnings he would, under the equitable rule, have received that portion which was earned during his tenancy. Thus, it is argued that the sale is in substance an indirect distribution of the accumulated earnings so that equity should reach the same result as if there had been a direct distribution by way of a declared dividend.

While this argument is in theory an appealing one, it is fraught with impracticalities. It is conceded that it would not apply to profits on the sale of corporate stock where the increase in price is not attributable to the existence of undistributed corporate earnings. *In re Nirdlinger, supra.* Any increase in value attributable to speculation in the stock, enhanced good will, increase in market values or appreciation of the tangible assets of the corporation, are a part of the *corpus* of the trust. Consequently, in order to determine the equities in a particular case the initial inquiry must be directed towards ascertaining the specific causative factors

of the increase in the stock's market price. Professor Bogert's acute criticism of the *Nirdlinger* case pinpoints the practical objections to the application of the equitable rule to a sale of stock by a trustee. He says:

"Probably the principal objections to the doctrine of Nirdlinger's Estate are (1) the uncertainty of the causes for an increase in the market price of stock; (2) the vexation and expense caused to the trustee in disposing of gains on stock sales.

It seems extremely doubtful whether any one can ever know exactly why a certain stock has increased in market price twenty points between the date of the acquisition of it by a trustee and the date of its sale. The purchaser of the stock himself probably could not analyze his own reactions and tell why he bid 120 for the stock. He could not assign a certain percentage of his bid to one cause and another percentage to a second motive. Economic and business experts can give testimony which is sure to conflict.

The court in allocating a part of the increase to the life *cestui* is accomplishing dubiously approximate justice and is acting on the basis of guesswork and opinion to a great extent. Any trustee who has to decide such a question must indeed be puzzled. If he tries to make a decision on his own account, he will have to spend a great deal of time and some trust money in getting the corporate history of the organization issuing the stock, in studying market reports, and taking the advice of experts. He runs the danger of making a decision which may lay him open to liability at the hands of either L (life *cestui*) or R (remainderman). In cases of importance, litigation to get the opinion of the court will be almost a certainty. No precedents will help in deciding such a question. Each case will be different. The gain to both life *cestui* and remainderman may well be eaten up in court costs and lawyers' fees.

If the profit is allocated to the *corpus* of the trust, a simple easy rule is established, from the application of which both life *cestui* and remainderman will benefit, since L will at once have an increased income.

The doctrine of Nirdlinger's Estate is an extension of the Pennsylvania rule about the apportionment of the products of stock distributed by the corporation. It seems a commendable effort to reach exact and absolute justice. But it also seems unworkable and undesirably costly of time and money in its practical application to business affairs. The Uniform Principal and Income Act is opposed to the doctrine of Nirdlinger's Estate." 4 *Bogert, Trusts and Trustees*, § 824, *pp.* 273, 274 (1948).

There is no doubt that the rule in the *Nirdlinger* case attempts to do ideal justice between the life *cestui* and the remainderman. However, it appears that the rule is un-

workable in that neither the trustee nor the court has the means to determine with any degree of accuracy what portion, if any, of the sale price of corporate stock is assignable to the existence of undistributed earnings. The difficulty, uncertainty and expense incident to such a determination would appear to outweigh the commendable result sought to be achieved. For it is a virtual certainty that if the rule is adopted any experienced trustee who sells corporate stock and is faced with the problem of equitable apportionment of the proceeds would resort to the courts for its solution, rather than risk liability to either party. It is indeed small consolation to either the life *cestui* or remainderman that equity has apparently been served, if the ultimate result of the endeavor is to substantially reduce the net gain available to the trust estate and the final determination of the respective equities of the parties is founded as much upon speculation and guesswork as it is upon fact. These factors, together with the increasing complexity of corporate structures and accounting methods, which progressively makes more difficult and costly an accurate analysis of the past financial history of a corporation, are practical realities that persuade us to reject the rule of the *Nirdlinger* case. In reaching this conclusion we have been considerably influenced by the repudiation of the rule by the Pennsylvania Legislature, the New Jersey Legislature, the *Restatement of Trusts* and the Uniform Principal and Income Act.

██ While the provisions of *N. J. S.* 3*A*:14*A*–7, which would allocate the entire proceeds of the sale of corporate stock to principal, is inapplicable to the present trust, we are not insensitive to the principle it embodies. The exclusion from its operation of trusts created prior to its enactment does not codify any pre-existing rule governing the apportionment of the proceeds from the sale of such stocks. *In re Traung's Estate, supra.* Since the question is an open one, we prefer to adopt a rule consonant with modern judicial and legislative attitudes. Accordingly, where the testator has not indicated a contrary intent, the proceeds of a sale of corporate stock by the trustee, although they may

be greater than they would have been if the corporation had not retained earnings accruing since the inception of the trust, are allocable to principal and are not to be apportioned.

The appellant, however, asserts that the testator evinced in his will "a clear intention" that the life beneficiary receive "the portion of the purchase price of the Faber stock representing undistributed earnings of the company during the existence of the trust"; that the gift of the "whole of the net income" was intended to encompass "the entire net earnings" of the corporation. Both parties concede that the testator's intention, if perceivable, is controlling. There is little doubt that a testator could effectively provide that what would otherwise be deemed principal should be income and that what would otherwise be income should be principal. *In re Fisher's Estate,* 115 *N. J. Eq.* 329, 332 (*E. & A.* 1933); *Jackson v. Jackson,* 22 *N. J. Super.* 269, 274 (*Ch. Div.* 1952). Hence it must be borne in mind that the apportionment rule is not a rule of property but only a rule of construction utilized to effectuate the presumed intention of a testator, who has failed to manifest any specific intention other than a general direction that "income" go to the life *cestui* and "principal" to the remainderman.

It is to be presumed that when the testator employed the words "the whole of the net income of my estate," that he intended these words to be given their ordinary and natural significance. See *Christ's Home v. Mattson,* 140 *N. J. Eq.* 433 (*E. & A.* 1947). The testator was a stockholder not only of Faber corporation but of other corporations as well. As such, it may be inferred that he was aware of the fact that until a dividend was declared by the corporation no income would be received by the shareholders. It is equally inferable that he was familiar with corporate practices, in that corporations usually retain a portion of their earnings for divers reasons, and that dividends declared do not as a general rule equal current net income. Hence, if he had intended that the life *cestui*

receive something more than declared dividends it is probable that he would have used language in his will to express such an intention. It would thus appear that in the absence of language to the contrary the testator intended "income" to be determined by corporate dividend action.

Moreover, it cannot be said that the will considered in its entirety reflects an intention to favor the life beneficiary over the remainderman. The allocation of the entire proceeds of the sale to *corpus* will inure to the benefit of both; the life *cestui* will immediately get the value of its use for life and the remainderman will receive the balance of its value, without subjecting the estate to the expense of attempting to ascertain by inexact means, the equities between the parties. While complete equity is indeed a cherished goal, the courts also must be cognizant of the desirability of developing simple, workable rules of construction, particularly where the attempt to do equity may itself work to the ultimate disadvantage of the participants. Workable rules are after all nearest the testator's probable intent.

The judgment is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, BURLING, JACOBS, FRANCIS and PROCTOR—6.

*For reversal*—None.