G. Robert Witmer, J.
This is a proceeding under article 79 of the Civil Practice Act for the judicial settlement of the account of Security Trust Company of Rochester as trustee under trust indenture dated March 28, 1921 by which Adele H. Clark, grantor, conveyed to the trustee certain securities upon trust for the payment of the income to herself for life and upon her death the corpus to be divided into as many shares as she left sons, one share thereof to be held in continuing trust for each son, and upon the latter’s death the corpus to be paid to his children or next of kin.
Included in the securities conveyed to the trustee were 500 shares of common stock of Eastman Kodak Company. The grantor died in 1944, at which time the trust corpus was divided into three parts, and one part, then including 1,667 shares of Eastman Kodak stock, was continued in trust for her son Halford R. Clark. He died in September, 1959 without issue, leaving as next of kin his two brothers. The trust having thus terminated, the trustee has rendered its account and seeks approval in this proceeding. The executors of the estate of said Halford R. Clark object to the account because the trustee allocated to principal a 1 for 1 stock distribution made by Eastman Kodak Company in the Spring of 1959. A brother, Brackett H. Clark, supports the trustee in its allocation of said stock distribution.
It appears that there have been many changes in the common stock of Eastman Kodak Company since this trust was created in 1921. In 1922 the stock was split 10 for 1. In 1929 and in 1939 stockholders were given rights to purchase a share of stock at a stated price for each 10 shares of Kodak stock then held. In 1947 the stock was split 5 for 1, so that there were *508 then 8,335 shares of said stock in this trust for Halford R. Clark. In each of the years 1948, 1949, 1952, 1954 and 1956 a stock dividend of 5% was paid, and in each of the years 1950 and 1951 a stock dividend of 10% was paid. In the Spring of 1959 the 1 for 1 stock distribution in question was made, amounting to an additional 8,335 shares.
The stock issued in the 5 for 1 stock split of 1947 was allocated to principal, in accordance with a holding in a similar case. (See Matter of Strong, 198 Misc. 7, affd. 277 App. Div. 1157.) The stock dividends paid between 1948 and 1956 were allocated to income and delivered to the life beneficiary. It is stipulated that if the 1959 stock distribution were allocated to income, the value of each share retained by the trustee in the principal account would exceed the original value of each share when the trust was created in 1921; that is, the so-called “ intact value ” would not be impaired by treating the distribution as income.
In its letter of April 13, 1959 to its stockholders the Eastman Kodak Company advised of the distribution and said: “ The purpose of this stock distribution is to place in the hands of each shareholder tangible evidence of his share in the portion of the earnings of the Company which have been retained for use in the business and which are being capitalized by the stock distribution. * * * The receipt by you of this stock distribution does not increase your proportionate equity in the Company. However, a disposal of such stock distribution will reduce your equity in the Company by 50%.”
The company added that there were outstanding 19,191,123 shares of common stock of the par value of $10 each, and that the additional shares being distributed, of equal number, were of the same par value. It explained that when it issued the stock dividends during the years 1948 through 1956, it transferred from the earned surplus account to the capital surplus account an amount on each occasion equal to the difference between the $10 par value of such stock and the fair market value thereof, such transfers totaling the sum of $257,587,353. This was in compliance with section A-13 of the New York Stock Exchange regulations. When the stock dividends were issued, $10 for each share was also transferred from the earned surplus account to the capital account.
The company stated that from its capital surplus account it was transferring to its capital account $10 for each share of the stock distribution, namely, the sum of $191,911,230. It further explained that “ The Earned Surplus Account consists entirely of earnings derived from the business operations of the Company.”
*509 In Matter of Osborne (209 N. Y. 450), the court sought and propounded a principle for doing justice as between the income beneficiaries and the remaindermen of a trust in a stock distribution case, holding that the “intact value ” of the stock when the trust was created must be preserved for the remainder-men, and that, in that case, the rest of the distribution was for the life beneficiaries. Although the principle seemed to be a fair and equitable general proposition, the scores of cases decided since then attest to the contrary and to the fact that it has complicated the problem. This situation is an excellent illustration of the statement by Oliver Wendell Holmes, Jr., in his work The Common Law (p. 1), that “ The life of the law has not been logic; it has been experience. ’ ’
Since the Osborne decision, changing social and economic conditions and business practices, magnified by the ingenuity of corporate managers and their advisers, have demonstrated the inadequacy of the principle there laid down. It not only requires the court upon a trust accounting to re-examine the financial affairs of every corporation which has made a stock distribution to the trust, but it confronts the court with the impossible task of ascertaining the multifarious meanings of many accounting terms and of "ascertaining “value” from books and records which afford no sound basis from which a court may determine values at various antecedent times. (See Earned Surplus — Its Meaning, etc., 38 Va. L. Rev. 435; Extraordinary Corporate Distributions, 4 Syracuse L. Eev. 293; Note, Extraordinary Stock Distributions, 35 N. Y. Univ. L. Eev. 810, 816, 819.) Moreover, because of government tax depreciation regulations corporations cannot charge to earnings the full cost of replacement of plants and equipment, and a large part of earnings are required to be retained by the corporation as capital to maintain a modern operating business; and hence it is debatable whether they are truly “ earnings ”. In addition, generally speaking, corporate growth comes from many sources difficult of appraisal and separation. In the case at bar, we are told that the capital surplus came from earnings. It is fundamental that increased corporate assets, including pure corporate earnings as such, are not income to the stockholders until they are declared so to be by the directors by the declaration of dividends. The foregoing are some of the underlying reasons why the Osborne rule has been called “ artificial ” (Matter of Fosdick. 4 N Y 2d 646, 657). The court is not equipped to second-guess or overrule the directors of such corporations in these matters; and a simpler rule is needed.
*510 The Legislature early recognized this and in 1926 amended section 17-a of the Personal Property Law (L. 1926, ch. 843) to provide that in the absence of contrary provision in the trust instrument, stock dividends should be allocated to principal; but such statute is not applicable to trusts created before its enactment. In United States Trust Co. v. Heye (224 N. Y. 242, 252-253), the court declared that the equitable apportionment rule does not cause the trust principal to remain static. Throughout the years there have been observations of courts and legal writers that the principle of the Osborne case should not be or will not be extended. (See Matter of Payne [Bingham], 7 N Y 2d 1, 8 and 12; Matter of Strong, 198 Misc. 7, 16 and 20, affd. 277 App. Div. 1157, supra; Matter of Lindsay, 11 Misc 2d 374, 381; Extraordinary Corporate Distributions, 4 Syracuse L. Rev. 293, 302; Note, Extraordinary Stock Distributions, 35 N. Y. Univ. L. Rev. 810, 819.)
In Matter of Payne (Bingham) (supra), the court did not attempt to lay down a new general rule. It noted (p. 9) that the Osborne “ intact value ” rule 11 was intended as a minimum figure below which the corpus of the trust could not be reduced, not as a jumping-off place above which income could claim everything.” The court then proceeded, by way "of fuller discussion of the problem, to state the exact situation which now confronts this court and said that the transfer of capital surplus to the capital account (as was done in this case) would not invoke the Osborne rule, saying at page 11: “ Frequently, capital surplus is created through the use of earnings to support ordinary stock dividends which the income beneficiary will already have received. A rule of the New York Stock Exchange, required and enforced by the Securities and Exchange Commission, demands that, when a stock dividend is declared, the earned surplus account of the corporation must be charged with the market value of the stock to be distributed, not merely its par or stated value. (See N. Y. Stock Exchange — Company Manual, § A-13; Rappaport, SEC Accounting Practice and Procedure [1956], p. 312.) Since, ordinarily, only par or stated value goes into the capital stock account, the excess of market value over par or stated value is transferred to capital surplus. The income beneficiary receives the shares thus capitalized. If capital surplus thus derived is subsequently transferred to the capital stock account to support a further issuance of stock, the award of any such stock to income would actually represent a double distribution to the income beneficiary of the identical earnings! Consequently, even if capital surplus is in part made up out of earnings capitalized in years gone by, it is *511 generally accepted that the further transfer of such earnings from capital surplus to the capital stock account does not constitute such a capitalization of earnings as will call the Osborne rule into play. ’ ’
In said Payne case (supra), part of the capitalization came from earned surplus but ‘ ‘ a significant part of the total capitalization ’ ’ came from capital surplus, and the court allotted entirely to principal the stock dividend based thereon. This court is in complete agreement with the holding in the Payne case and deems it controlling herein. Under this rule the court must still protect the equities of the remaindermen and the life beneficiaries by looking to the source of the dividend. But in the absence of a showing of fraud or illegality, the court will not in effect set aside the acts of the corporate directors. Thus, if the directors have lawfully transferred eariiings to capital surplus, they cease to have the characteristics of earnings for dividend purposes, and stock issued thereon will tint be allocated to income. Although this rule 'will by no means solve all the problems of stock distributions to trusts, it will serve to reduce the number of such problems and is a step in the right direction, that is, toward reasonable certainty as to how stock distributions should be allocated.
It is held, therefore, that the stock distribution of 1959 was properly allocated to trust principal. The objection thereto is dismissed; and the account is approved as filed.