## In re Estate of William H. Valiquette

[173 A.2d 832]

May Term, 1961

Present: **Hulburd, C. J., Holden, Shangraw, Barney and Smith, JJ.**

Opinion Filed July 12, 1961

Motion to Clarify Denied September 5, 1961

*Edwin W. Lawrence* and *Colton & Pinkham* (of the New York Bar, of Counsel) for the appellant.

*O'Neill, Delany & Valente, Edmunds, Austin & Wick, Webber, Costello & French, Charles J. Marro* and *Frank L. Bunting* for the appellees.

**Hulburd, C. J.** The trustee, George G. Smith, of a trust estate created by the will of William H. Valiquette, is seeking a declaratory judgment. In his petition, he alleges that the will of this testator created two trusts, one of which was for the benefit or the testator's niece, Marie Olivette Ditmars (life tenant), providing for payment to her during her lifetime of all "rents, issues and profits" of the trust estate. Upon the death of the life tenant, the trust was to terminate and the principal was to be distributed as specified in the will. During the life of the life tenant, from July 15, 1919 through November 30, 1959, by reason of purchases, stock splits, and stock dividends, the original 20 shares of common stock of Eastman Kodak Company, belonging to the trust estate, increased to a total of 3,742 shares. It

was this increase which prompted the trustee to present his petition to Rutland Probate Court: "That a determination be made concerning the shares of Eastman Kodak Co. received as stock dividends as to whether the same constitute corpus or income, reference being had to the case of *In re Heaton's Estate,* 89 Vt. 550, 96 A. 21, L.R.A. 1916D, 201, and the provisions of Sections 3301-3313, Title 14, Vermont Statutes Annotated."

It was further alleged by the trustee in his petition: "that no judicial determination has been made concerning the shares received as stock dividends as shown by said Schedule B-5 as to whether they constituted corpus or income or both; and that the same have been retained by the Trustee at the request of Marie Olivette Ditmars, the life tenant, now deceased."

To this petition, the executor of the estate of the life tenant (the appellant) filed an answer admitting the allegations of the petition setting forth all of the statistics concerning Eastman Kodak Company designed to show the source of the dividends and claiming thereby to meet the rule of the Heaton case. On this basis, he lays claim to 2,528 shares of the Eastman Kodak Company stock. Various persons, claiming to be remaindermen, also filed answers and asserted that all stock distributions were corpus. None of the answers contained any allegation that the question of proper allocation of the stock had been previously determined; nor is there anything in the findings tending to indicate that this became a contested issue at the hearing before the probate court. The following letter from the trustee to the life tenant was put in evidence and found as a fact in connection with the hearing:

April 17, 1953

Mrs. Marie O. Ditmars
431 Park Avenue
New York 22, N. Y.
Dear Mrs. Ditmars:

Recently I had occasion to become acquainted with a Vermont Supreme Court decision identified as Heaton vs. Heaton.

The substance of this decision is that a stock dividend received by a trust, the payment of which does not reduce the capital account below the level at which it was when the stock was acquired, shall be treated as income.

I have taken legal counsel on the subject of the Eastman Kodak and Colgate-Palmolive-Peet stock dividends received by me as Trustee. I am advised that the proper procedure is for you to bring suit to obtain a declaratory judgment ordering me as Trustee to deliver the stock to you. This action must be initiated by you, and in addition to me as Trustee, the remaindermen of the trust must be made parties to the suit.

Since it is impossible at this time to determine who the remaindermen will be, it was suggested that to avoid complicated, and, as a result, expensive legal maneuvering, and since you are receiving the income benefit from the shares involved, a statement of the facts be filed with your Will and your Executor placed on notice to file a claim at the termination of the trust, when the final account of the Trustee is made.

A rough calculation indicates that since Kodak began making stock dividends in 1947, and including the one payable in May of this year, 556½ shares of stock of this Company are involved. Their current market value is approximately $26,000.

I have not investigated the Income Tax angle but think it should receive attention.

I will be glad to give you whatever other assistance I can in helping you determine your ultimate course of action, and am agreeable to any action you may elect to take.

Sincerely,

GGS/hm                                Geo. G. Smith.

Some two years later, in June 1955, the life tenant wrote the trustee a letter with reference to the 1954 accounting of the trustee. After saying that the accounting was entirely satisfactory to her, she continues on, and, with the letter from the trustee to her of April 17, 1953 obviously in mind, she said: "Don't those stock dividends look nice? Hope they keep coming! As they are income I suppose they belong to me and go in with the others you wrote me about on the same basis. We don't need to think about it now as I wouldn't sell them any way."

It is clearly apparent that at the hearing the appellant was seeking to follow along the lines indicated in the letter to the life tenant from the trustee and thus seeking to prove that the stock dividends were income within the doctrine of the Heaton case, while counsel for the remaindermen were urging that in accordance with the trend of the

more recent cases in other jurisdictions, all stock distributions constituted corpus.

Sometime after the hearing, the probate court sent "tentative findings" to all counsel. These included findings that the trustee, after each of the dividends in question, had filed an annual account; that it appeared in such account that the prior-received stock dividends had been included by the trustee in "trust estate" and not in income; that the statutes in respect of notice by publication had been complied with; that the account was allowed; that the life tenant had taken no appeal and, therefore, that each of such accounts constituted *res adjudicata* which barred the life tenant from raising the question.

When it thus appeared that this unexpected consideration was threatening to enter into the disposition of this case, the appellant submitted objections and exceptions to those findings having to do with *res adjudicata*. He also made a motion to correct or revise the prior records of the probate court, supporting it with an affidavit by the trustee which included the following statement: "I never intended by any of said accounts to make or indicate any allocation of any of the stock dividends referred to above as between corpus and income, but I always understood and believed that that question was left open for a later judicial determination."

This precipitated a flurry of tactical maneuvering. One of the remaindermen filed a cross-motion to expunge the trustee's affidavit. A hearing followed. No testimony was taken although the appellant moved to reopen and be allowed to recall the trustee. This motion was denied by the probate court and it stated: "I will exclude any testimony relating to any prior account; they are all recorded and allowed by me." The court went on to grant the motion to expunge the affidavit of the trustee. The tentative findings mentioned above became a part of the final findings. The court proceeded to find that all of the stock splits, stock dividends, and stock distributions of whatever nature made by Eastman Kodak Company were *corpus* and not income. In making this finding it candidly refused to apply the rule laid down in the Heaton case because it stated that this rule, commonly known as the Pennsylvania rule, was wrong in principle and outmoded in operation. The court set forth at some length the reasons why it deemed this to be so. A judgment was entered declaring all stock distributions to be *corpus*. It provided that all pertinent files and

records of the probate court were made a part of the findings. It made it clear that such files were considered in arriving at the judgment. It is from the rulings of the probate court and from its judgment order, as aforesaid, that the executor of the estate of the life tenant brings his appeal to this court.

Perhaps a little chronology should be available in connection with this opinion. William H. Valiquette, the testator, died in 1918. His will was dated May 3, 1911, with a codicil dated December 24, 1912. *In re Heaton's Estate,* 89 Vt. 550, 96 A. 21, L.R.A. 1916D, 201, was decided in 1915. The life tenant died March 17, 1959. The Uniform Principal and Income Act was enacted into law in this state in 1957. The first of the stock dividends of Eastman Kodak Company involved here were declared in 1948. The last, as such, was declared in 1956. In addition, on February 17, 1959, the company declared a "stock distribution" of one-for-one to the stockholders of record as of March 9, 1959.

In the Heaton case, *supra,* this Court was presented with a situation involving the same proposition that we have here. It considered the three prevailing rules concerning the ownership of stock dividends as between the life tenant and the remaindermen of a trust: the Massachusetts rule, so-called, under which all stock dividends are regarded as principal and so go to the remaidermen: the Kentucky rule, so-called, under which all dividends, whether stock or cash are treated as income and hence go to the life tenant; and the Pennsylvania rule, so-called, under which there was an attempt to look behind the distribution to the source of the dividend and to classify "a dividend according to what it really represents and not according to the form in which it is declared." *In re Heaton's Estate, supra,* at p. 571. The Court lead into the discussion of the problem by saying: "In construing his will it is only reasonable to presume that the testator used the word "income" in the sense it would have when applied to the stock while he was living; so that what would have been income to him, if living, should be regarded as income to his estate after his death." P. 568. The Court went on to adopt the Pennsylvania rule, saying: "By the rule we adopt the life tenant receives all the profits of the corporation accumulated during the life of the trust which are released from corporate control and distributed among the stockholders during the life tenancy, regardless of the form of the distribution; and the remain-

derman receives at the end of the term the corpus of the trust fund undiminished in value from what it was at the inception of the trust, which is all that he can justly claim, unless the creator of the trust has evidenced an intention that he shall receive more. It works out exact justice between the parties and, we believe, will more often give effect to the unexpressed intention of the testator." Thus the rule, which this Court adopted, was one which attempted to tailor the determination to fit the circumstances. The approximations of a ready-made article were to be avoided: the Massachusetts rule was rejected as being a rule of mere convenience.

As time went on, however, corporations became more sophisticated in their financial structure and bookkeeping. When *Heaton* was decided, this Court felt the effort required to apply the Pennsylvania rule was justified by the result "despite the difficulties attending it." We are convinced, however, that the Court had no real appreciation of how great these difficulties were to become. It did not forsee, to use the words of Dean Niles, "the exotic hybrids that bloom in the present Wall Street greenhouses forced by attempts to save taxes and to get wider public participation in stock ownership." *Proceedings of the Probate and Trust Law Divisions of the American Bar Association, 1959.* In short, what was practical for 1915 became disturbingly complex as time went on.

Undoubtedly it was this change in conditions, at least in part, which prompted the legislature in 1957 to enact No. 171 of the Acts of 1957, known as the Uniform Principal and Income Act. By this Act, dividends payable other than in corporate stock are to be regarded as income and stock dividends as *corpus;* in consequence, by virtue of the statute, the Massachusetts rule was, in effect, virtually substituted for the Pennsylvania rule formerly adopted by this Court. In the same way, a number of other states which had previously had the Pennsylvania rule, enacted statutes similar to that passed by our legislature. There can be no question but that, one way or another, the trend is now toward the Massachusetts rule. See Scott on Trusts, 2d Ed., Sec. 236.3 at page 1813: see also annotation in 44 A.L.R.2d. 1287; cf. Restatement of the Law of Trusts 2d, Sec. 236.

It is at this point that we wish to quote again from Dean Miles' article mentioned above. He makes this statement: "The dissatisfaction with the Pennsylvania equitable apportionment rule as to stock dividends has led to the adoption of the Massachusetts rule in most

leading jurisdictions. Unfortunately, however, the statutes that abolish that rule are generally prospective only. Recent cases make it imperative that we try to hasten the inevitable day when quiet and order will descend upon this old battlefield."

This quotation leads us into the heart of our problem. We have little doubt, too, that it may have spurred the probate court below in its attempt to hurdle all difficulties to reach the desired end. The final section of our Uniform Principal and Income Act, *supra*, reads as follows: "Sec. 15. *Time of taking effect.* This act shall take effect June 1, 1957 and shall apply to all estates of tenants or remaindermen which become legally effective after that date." A comparison of this section with its counterpart in the original prototype act shows they are identical in language. It is clear that it was drawn to be prospective in operation and it is generally so regarded. Although some authorities have recommended amending the Principal and Income Act to extend its application to all corporate stock distributions made after the effective date of the amendment, regardless of the date of the creation of a particular trust estate (see Maryland Law Review Vol. 20 pp. 89, 115), attempts to make the statute apply retroactively have been thought to present constitutional difficulties. See *In re Crawford's Estate,* 362 Pa. 458, 67 A.2d 124; *In re Fera's Estate,* 26 N.J. 131, 139 A.2d 23, 76 A.L.R.2d 152. Other authorities, pointing to *Tidal Oil Co.* v. *Flanagan,* 263 U.S. 444, 44 S. Ct. 197, 68 L.Ed 382, feel that there would be no constitutional objection from the United States Supreme Court. See Brooklyn Law Review, Vol. 26, pages 317 and 322.

In the state of Wisconsin the Uniform Principal and Income Act was enacted in 1957, but with the following provision as to its effective date: "This section shall apply to all estates of tenants or remaindermen which are effective July 10, 1957 or which shall thereafter become effective." Thus the Wisconsin statute was specifically applicable to estates in being on the effective date. In the case of *In re Allis' Will,* 6 Wis. 2d 1, 94 N.W.2d. 266, 69 A.L.R.2d 1128, subsequent to the passage of the act, a trustee acquired a stock distribution and applied to the courts as to its proper allocation. The court held that the new act governed and that the distribution was to corpus. In arriving at its decision, the Wisconsin supreme court said:

"If this court had seen fit by court decision to reverse the rule of the Soehnlein case and adopt the Massachusetts Rule, without

a caveat that the newly adopted rule should not apply to pre-existing trusts, no constitutional problem would be presented. This was made clear by Mr. Chief Justice Taft in *Tidal Oil Co.* v. *Flanagan,* 1924, 263 U.S. 444, 44 S. Ct. 197, 68 L.Ed. 382. It was therein held that the mere fact that a state supreme court decides against a party's claim of property or contract right by reversing its earlier decision of the law applicable to such cases, does not deprive him of his property without due process of law nor amount to the passing of a law impairing the obligation of a contract."

In the Wisconsin case the dividends were received following the enactment of the uniform statute. In the case at hand, the dividends (except the 1959 distribution) were in the trustee's hands prior to the enactment of the statute. In the Wisconsin case the court had said: "—it is our considered judgment that the legislature could change such rule with respect to any stock dividends subsequently declared without violating the due process clause of the Fourteenth Amendment." Under Wisconsin law, therefore, the courts of that state would seem to justify constitutionally an allocation like the 1959 distribution here to corpus, but, as to the rest of the dividends involved here, which were not *declared subsequent to the statute,* the decision fails to reach the question before us. *In re Allis' Will, supra,* therefore, does not furnish us much in the way of a precedent: first, because of the section of the act as to its effective date of operation, and secondly because none of the dividends involved here were declared subsequently to the act except the 1959 distribution.

The appellees urge, however, that apart from the statute, we can and should overrule the Heaton case and so do away with it and the Pennsylvania rule once and for all. It comes to this, can we—and should we—in the light of our uniform statute, and its effective date, change the law now so as to affect rights of action actually accrued under the Heaton case and prior to the statute changing the rule? Should we not only stop the clock, but definitely turn it back? Certainly our legislature was in a position to do all that we can do and it chose not to do more than it did; it did not set out to change the law retroactively. We think that although the legislative action was not pre-emptive in nature, it was close to it, and that this Court, or any other Vermont court, ought to be very reluctant about stepping into

the situation and enlarging the scope of the enactment by changing its effective date.

Without getting into what this Court could or could not constitutionally do, we are convinced that common fairness dictates that the rule of the Heaton case should be applied, at least, to those stock dividends which were received by the trustee prior to the 1959 distribution and before the uniform statute. The same principle which inclines courts not to favor the retroactive operation of a statute (see 82 C.J.S. p. 980 et seq.) should be given effect when a court is asked to overrule a previous decision. This is merely the doctrine of *stare decisis* in another form. We think, too, that in holding that the rule of the Heaton case should be applied as to the stock dividends prior to 1959, we are acting in consonance with the statute and giving effect to its general intent of prospectiveness which the legislature apparently had when it passed the uniform act.

It is in this connection that *Langdell* v. *Dodge,* 100 N.H. 118, 122 A.2d 529 becomes of interest. New Hampshire, like Vermont, had formerly subscribed to the Pennsylvania rule. Its supreme court apparently became convinced, as we are, that the Massachusetts rule is better adapted to present conditions. In the Langdell case, in 1956, the New Hampshire court overruled its previous decision in which it had adopted the "Pennsylvania Rule" (known as the Holbrook rule in New Hampshire) but in so doing it felt the necessity to state: "This opinion will not be retroactive to affect prior reliance on the Holbrook Rule." Thus, the New Hampshire court is applying the same principles which we think should be controlling in this case.

This leaves the 1959 "distribution" by the Eastman Kodak Company for consideration. If this were a stock dividend which brought itself clearly within the Heaton rule, it would not be easy to deny the life tenant the benefit of the rule of the Heaton case even though it was subsequent to the passage of the Uniform Act. However, the 1959 distribution was charged entirely against capital surplus and not against earned surplus, and following the issuance of the 1959 distribution the market price of the stock was about one-half that prior to distribution. It would appear that the 1959 distribution was a stock split and not a stock dividend. This identical stock distribution came up for consideration in *In re Clark's Trust,* 25 Misc.2d 506, 204 N.Y.S.2d 795 and the court there held that the stock was

properly allocated to corpus. Although this case was not decided by a court of last resort, it adopts a point of view which we think is appropriate at this time. We have reached a period, we think, where there should be no doubtful or complicated extensions of the Pennsylvania rule. It is too late to embroider on a rule which is on its way out, or to cling to it by niceties of reasoning. Cf. *Cunningham's Est.*, 395 Pa. 1, 7, 149 A.2d 72. Our chief objective is to see that the old rule fades out in a manner as little disruptive as possible and with due regard to common fairness. We are in accord, therefore, with the probate court when it found that the 1959 stock distribution was corpus and not income.

■■ We now come back to a matter mentioned earlier in the opinion, namely, the position taken by the probate court that the adjudication in connection with the annual accountings, presented by the trustee, pursuant to 14 V.S.A. §2324, has made the question *res adjudicata* anyhow as to the allocation of the stock dividends. At the outset, it is well to understand that an examination of the accounts themselves shows that they contain no explicit statements that stock dividends have been allocated in any specified manner. In fact we can find nothing in them to indicate even that stock dividends had been received by the trustee at all during a given year. They are not mentioned. All that the accounts show is that in the attached "Schedule B of the Trust Estate" there were listed each year a certain number of shares of stock in the Eastman Kodak Company. How they were acquired does not appear. On an account so submitted, after notice by publication, the probate court made the entry of "allowed and ordered to be recorded." Without going further, we think there was no basis for the probate court taking the position that, by the allowance of the trustee's annual accounts, it thereby adjudicated that the stock dividends had been properly allocated to the corpus of the trust. As the appellant points out, and properly so we think, the trustee has no interest in controversies between beneficiaries and he is in no position to decide such questions or to have them decided by the mere filing of an annual accounting of this nature. In any event, where such accounting does not raise the question in a manner to apprise the probate court that it exists, it is difficult to see how it can be said that the court has passed on it. There was nothing in the annual account to inform the probate court that it was adjudicating a

question of this sort. Had there been, the whole matter might take on a different complexion. As it was, we think the general rule as enunciated in 90 C.J.S. §416 at page 801 applied: "An accounting is not *res adjudicata* as against the parties unless the proceedings clearly disclose the transactions intended to be embraced therein and the burden is on the person claiming an estoppel by judgment to establish such disclosure." It would seem in the circumstances of this case, and in view of the correspondence between the trustee and the life tenant bearing on this very issue, that no room is left to entertain the idea that the question had been submitted to the court for adjucation and had been litigated and settled. A decree of a probate court is conclusive on only those matters directly passed upon by the court and no further. *Sparrow* v. *Watson,* 87 Vt. 366, 371, 89 A. 468. It has been urged upon us that the failure of the life tenant to seek a declaratory judgment was a waiver by her of any right to the stock dividends, and that by her conduct she is barred not only by *res adjudicata* but by her acquiescence. The right to apply to the courts was not exclusively the life tenant's. The trustee, himself, could have applied. We agree that it is perfectly clear that the life tenant was aware of the problem of allocation. It is equally clear that she was aware that the trustee was aware of the problem, and had acknowledged to her her possible rights. There was no knowledge on the part of the life tenant that the trustee proposed to withhold from her wrongfully any stock dividends or that a breach of trust was contemplated or had been perpetrated. To constitute a waiver by one in the position of the life tenant, it must appear that she unequivocally recognized an allocation of the stock dividends to corpus. Compare *American Fidelity Co.* v. *Daniels,* 122 Vt. 14, 18, 163 A.2d 617. The circumstances do not disclose that this was the case. The trustee had informed the life tenant that he was "agreeable to any action you may elect to take." In such circumstances, we cannot say that the life tenant, either by waiver, acquiescence, or estoppel relinquished her rights so that her executor is now barred. We hold that the position of the probate court cannot be sustained by reason of the trustee's annual accounting and that the question of stock allocation had not become *res adjudicata.*

From what we have already said it should be clear that the probate court's declaration that all shares of stock in the Eastman Kodak Company are held by the trustee as principal is in error.

*Judgment reversed and cause remanded to the Probate Court for the District of Rutland with directions that it revise its declaratory judgment in accordance with the opinion in this case. Motion to clarify denied.*

[173 A.2d 839]

**Holden, J.** In addition to the problem of administering the allocation of stock dividends presented *ante,* a further question arises · concerning the distribution of the corpus of the trust. The trustee's petition for declaratory relief seeks a construction of the will to ascertain the remaindermen designated to receive distribution of the residuary estate at the expiration of the interest of the life beneficiary, Marie Olivette Ditmars.

The trust is measured on her life. She was a niece of the testator and died without issue on March 17, 1959. By subsection 2 of its ninth paragraph, the will directs the trustee

"* * * upon her death to pay and transfer the principal * * * to the issue of my said niece then living, the issue of any child of hers who may have died leaving issue to take the share which his, her or their parent would have taken if such parent were then alive.

"In the event of the death of my niece, Marie, during the lifetime of her mother, or in the event of my said niece dying without leaving issue her surviving, I give, devise and bequeath the share last mentioned to such of my heirs at law and next of kin as may be living at the expiration of the trust hereby created, and to the issue of such of my heirs at law and next of kin as shall have· died leaving issue, to be divided and distributed among them according to stock in like manner as directed with respect to the remainder in the share of my residuary estate heretofore given in trust for the benefit of my sister Mary and my brother George."

The "manner directed" for the share of the testator's sister Mary and his brother George is set forth in a preceding first sub-section of the will:

"In the event of the death of my brother George J. Valiquette during the lifetime of my sister Mary E. Valiquette, or in the event of his dying without having exercised the power of appointment hereby given him, I give, devise and bequeath said share to such of my heirs at law and next of kin as may be living at the

expiration of the trust hereby created, and to the issue of such of my heirs at law and next of kin as shall have died leaving issue, to be divided and distributed among them according to the stock in like manner as if I had then died intestate owning the property belonging to said share and leaving me surviving the above designated remaindermen as my only heirs at law and next of kin."

The probate court for the district of Rutland by declaratory judgment determined the next of kin of William H. Valiquette at the time of the death of Marie Olivette Ditmars to be first cousins of the testator. It found the persons entitled to the residue of the trust fund as remaindermen are the living first cousins of William H. Valiquette and the issue of deceased first cousins of the testator, *per stirpes.*

Two of three surviving first cousins, Julia Valiquette Clark and Napoleon J. Valiquette, appeal. It is their contention that the will provides two irreconcilable directives. Their argument is that the first provision bequeaths the residue to the issue of deceased next of kin, *per stirpes,* while the reference to the preceding section and the manner prescribed for the disposition of the trust for the benefit of the testator's sister Mary and brother George assign the remainder for distribution per capita according to the statute of descent and distribution.

14 V.S.A. §551 provides:—

    (4) If a decedent does not leave issue, nor surviving spouse, nor father, nor mother, the estate shall descend in equal shares to the brothers and sisters of such decedent, and to legal representatives of deceased brothers and sisters;

    (5) If none of the kindred above named survives the decedent, the estate shall descend in equal shares to the next of kin in equal degree; but a person shall not be entitled, by right of representation, to the share of such next of kin who has died.

Under this provision, children of deceased first cousins are precluded from sharing with surviving first cousins in an intestate estate.

The essence of the appellants' contention is that the use of the words, "as if I had then died intestate," incorporates canon five into the will, by reference. And since a per capita distribution to first cousins is provided by the statute, there is an irreconcilable conflict with the stirpital provisions, first stated in paragraph Nine. The

appellants declare that this repugnancy must be resolved by the application of two principles of construction.

■■ First, it is said that since it is impossible to find the testator's true intent, the expression last stated must prevail, in accord with *Cheney's Exr.* v. *Stafford,* 76 Vt. 16, 19, 56 A. 88. But this is a rule of last resort. It is applied only in cases of absolute repugnancy, where the intent first expressed is destroyed and revoked by some later expression so that the two provisions cannot stand together. It is invoked only when all efforts to reconcile have failed. *Hibbard* v. *Hurlburt,* 10 Vt. 173, 177; *Fruh* v. *Fruh,* 316 Mass. 590, 55 N.E.2d 790, 791; 95 C.J.S. Wills, §621, p. 870; 57 Am. Jur. Wills, §1128, p. 721. It is more aptly and realistically applied to codicils, where sufficient time intervenes to permit a change of intentions. See *In re Estate of Daniels,* 116 Vt. 190, 193, 71 A.2d 586; *In re Peck's Estate,* 101 Vt. 502, 506, 144 A. 686. Application has been denied where the apparent inconsistency existed within the same provision of the will. See *In re Creighton's Estate,* 91 Neb. 654, 136 N.W. 1001, 1005; 57 Am. Jur. Wills, §1128, p. 723. And where the language used is obviously contradictory and inconsistent, that provision should prevail which most nearly accords with the intention of the testator as gathered from other provisions in the instrument. *Board of Directors of City Trusts* v. *Maloney,* 78 U.S. App. D. C. 371, 141 F.2d 275, 277, cert. den. 323 U. S. 714, 65 S. Ct. 40, 89 L.Ed. 574; 95 C.J.S. Wills, §621, p. 866.

Secondly, the appellants urge that the law favors a construction which will conform to the general law of inheritance, and since the statute requires a per capita distribution among the kindred concerned, the will should be construed accordingly.

■ This rule is somewhat at odds with the presumption that a testator did not intend to die intestate. *In re Peck's Estate, supra,* 101 Vt. at 507. In the facts of this case, it is resisted by the general rule that a devise or bequest to "heirs at law" or "next of kin" will be construed to accomplish a stirpital distribution where possible. *Mooney* v. *Tolles,* 111 Conn. 1, 149 A. 515, 520, 70 A.L.R. 608; 57 Am. Jur. Wills, §1292, p. 855; 96 C.J.S. Wills, §711, p. 85.

■■ These, like other canons of construction, are subservient to the master guide for construction of wills,—the intention of the testator. The primary duty of the courts is to search out the testator's

true intent from the language he has employed and give it effect insofar as this can be done legally. *In re Estate of Daniels, supra,* 116 Vt. at 193; *Tuttle* v. *Tuttle,* 112 Vt. 271, 278, 13 A.2d 523; *In re Beach's Estate,* 103 Vt. 70, 76, 151 A. 654; *Crossman* v. *Crossman's Estate,* 100 Vt. 407, 411, 138 A. 730. Force and effect must be given to every word written in the instrument if reasonably possible. If varying provisions can be reconciled, rather than declared repugnant, contradiction must yield to concordance. *Tuttle* v. *Tuttle, supra,* 112 Vt. at 278; *Ripley, Admr.* v. *Benjamin, Admr.,* 111 Vt. 76, 79, 10 A.2d 205; *McCloskey* v. *Gleason, Admr.,* 56 Vt. 264, 267, 48 Am. Rep. 770; 95 C.J.S. Wills, §621, p. 866.

We must take the expression, "as if I had then died intestate," with reference to the language which precedes it, the situation which confronted the testator, and the testamentary plan which he sought to accomplish. *In re Houghton Estate,* 118 Vt. 228, 232, 105 A.2d 257; *In re Estate of Simanton,* 118 Vt. 202, 204, 104 A.2d 918; *Holmes* v. *Holmes, Admr.,* 36 Vt. 525, 529.

A will ordinarily speaks as of the time of the testator's death. When the bequest is to members of a class, the beneficiaries are to be determined as of the date of the testator's death, unless a contrary intent is manifest by the language of the instrument. *In re Walbridge's Will,* 102 Vt. 429, 431, 150 A. 126. Here the will plainly tells us that it was the testator's design that the contingent remaindermen should not be ascertained unless and until the contingency occurred upon which their bequest depended, that is, the death of the life beneficiary without issue. Particular provision was required to postpone the identification of the remaindermen until the expiration of the trust. Thus he bequeathed this share "to such of my heirs at law and next of kin as may be living *at the expiration of the trust*—and to the issue of such of my heirs at law and next of kin as shall have died leaving issue, to be divided and distributed to them according to stock * * * in like manner as if I had *then* died intestate owning the property belonging to said share." (emphasis supplied.)

We conclude that the testator introduced the supposition of intestacy in the event of the death of the life beneficiary, without issue, solely for the purpose of identifying his next of kin as of the date of the happening of that particular contingency. The latter provision was for the purpose of designating the persons who would then be the testator's nearest blood relatives, and their representatives.

The dominant intention of the testator resides in the qualification of the bequest to his heirs at law and next of kin living at the expiration of the trust. The bounty was not limited to survivors alone. On the contrary, the gift is "to the issue of such—as shall have died leaving issue, to be divided and distributed among them according to stock—." A distribution *per stirpes* is clear and unequivocal. The subsequent reference to intestacy contains no direction to distribute per capita, and there is no instruction that the statute of distribution is to apply. The probate court could not properly infer such an intent when a contrary purpose was just previously expressed. This aspect of the judgment was without error.

*The distribution provided in the declaratory judgment of the probate court is affirmed.*